The TRIAX COMPANY, Plaintiff,

v.

The UNITED STATES of America, Defendant.

No. 626–85C.

United States Claims Court.

July 21, 1989.

Denver C. Snuffer, Jr., Murray, Utah, attorney of record, for plaintiff; Janice L. Frost, Timothy Miguel Willardson, and Maddox, Nelson & Snuffer, of counsel.

Sharon Y. Eubanks, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant; David M. Cohen, Director, and Stephanie Cates–Harman, of counsel.

## ORDER

NAPIER, Judge.

On August 5, 1982, the Naval Facilities Engineering Command (hereinafter referred to as "Navy") awarded a firm-fixed-price housing renovation contract to the Triax Company (hereinafter referred to as "Triax"). Contract No. N62467–80–C–0099 was designated as one for small business concerns, such as Triax, and called for the renovation of 486 military housing units in 111 buildings located at the Naval Air Station in Millington, Tennessee.

The firm-fixed-price of the contract at the time of award was $4,688,400. Triax's bid was the overall lowest of 15 bids, and amounted to 58 percent of the Navy's estimate for the job. The three lowest bids differed by less than 4.5 percent. Triax specialized in housing renovation projects and had successfully performed them for the Army, Navy and Air Force in the past.

Approximately 2 years before award of the contract, on June 23, 1980, a design contract was entered into between the Navy and the architectural firm Walk Jones & Frances Mah, Inc. (hereinafter referred to as "Walk Jones"). Under this contract Walk Jones was responsible for designing and preparing plans and specifications for the repairs and renovations to the 486 housing units in the subject contract (also referred to as "Wherry Housing Contract"). Accordingly, Walk Jones conducted a walk-through of the housing units to determine the necessary repairs.

A list of repairs was prepared for each individual unit. At the time of the survey, the units were occupied. Necessary repairs were categorized as typical work and atypical work. Typical work was defined as repairs that would be necessary for each unit, i.e., recurring repairs. Atypical repairs were identified as those which were not necessarily repetitive, but often unique for an individual unit. Upon completion of its survey, Walk Jones submitted its estimate for the Wherry Housing Contract repairs in the amount of $13,732,000. The firm determined that this is what it would cost the Navy under plaintiff's contract to prepare the units for acceptable minimum standards of habitability.

A subsequent review conference between Walk Jones and the Navy disclosed that the scope of work that the Navy could afford to include on the Wherry Housing contract would be limited by budget constraints. Consequently, the Navy determined that the scope of work would have to be reduced. At the review conference Navy personnel also informed Walk Jones that their repair survey did not include some items needing repair. Rather than require Walk Jones to conduct another survey to address these deficiencies, the Navy decided that its personnel would inspect each individual unit before construction began and include additional repairs under the contract pursuant to the "Changes" clause.

The Navy had contracted earlier with the Mitchell Construction Company (hereinafter referred to as "Mitchell") on a similar housing renovation project in Memphis, the Johnson & Conway contract. During the design stage of the Wherry Housing Contract, Navy personnel discussed with Mr. Mitchell the effectiveness of the system that the parties had used to add work items onto the basic Johnson & Conway contract. Conversations with Mitchell indicated that

the contractor had experienced difficulties in scheduling and performing the added work items in the manner that they were added to the contract. Because of its prior experience with the Navy's system of directing changes, Mitchell advised the Navy that such a system would create hardships for a contractor. Specifically, Mitchell explained that if the Navy's prior system of invoking changes was used on the forthcoming Wherry Housing contract, there would be attendant problems.

Approximately 8 months before the solicitation was released for plaintiff's contract, Navy personnel again reviewed the design work performed by Walk Jones. Upon completing his review, Ken Fulmar, the Navy's project manager under the contract at issue, requested that a Title II inspector be brought on board upon contract execution to estimate unit-prices for the anticipated flood of changes which were to be implemented later by change order.

Plaintiff did not include estimates in its bid for possible changes to the basic contract. Two of Triax's employees, Roger Durst, Project Manager, and Lyle Goodwin, Executive Vice President, conducted a pre-site inspection at the project site before submitting Triax's bid. Triax personnel, however, did not arrange for a formal site inspection with Navy personnel.

At the preconstruction conference, which took place 2 weeks after award of the contract and was attended by representatives of both Triax and the Navy, Fulmar informed Triax that there would be some changes to the contract, particularly atypical work changes. Fulmar did not quantify the anticipated changes.

The Navy introduced the Form A and Form B change order system at the outset of contract performance. At that time, Fulmar represented that the Form A and Form B system had worked smoothly on a previous contract, referring to the Johnson and Conway contract. Triax was to be given a list of Form A work items the day before work was to begin on a given unit. Work items added through Form B were to be initiated during actual construction work. Forms B were filled out in order to add those work items missed on the Form A pre-inspection. Unlike Form A work items, there was no pre-inspection for Form B jobs. At the time, Triax accepted use of the Forms A and Forms B as a way to add changes to the basic contract.

The Form A pre-inspections, which allowed the Navy to ascertain necessary Form A changes, were open for Triax personnel to attend. On occasion Triax personnel would work together with Navy personnel to record items on Forms A. Triax personnel requested receipt of Forms A a week or two in advance to allow Triax to schedule the work. According to the testimony of Hershel McConnell, Title II Inspector on the project, who reported to Ken Fulmar, Triax was not notified of Form A changes earlier due to his own personal reasons.

During contract performance, Triax workers discovered Form B work and notified the Government on a form proposed by the Navy, which had been used on the Mitchell contract. Approximately 6 months into the contract, this procedure was changed at Triax's request to indicate that the Navy addressed the Form to Triax. In either case, not until the Navy authorized the work was it to be performed by Triax.

Roger Durst of Triax was originally assigned as project manager on the contract. Triax intended, however, for James Vallett to replace Durst as project manager once Vallett completed another ongoing project.

On November 1, 1982, physical demolition of the first set of units began. At the time the first increment of houses was given to Triax, it also received more than 1,000 additive Form A work items to complete in these units. On November 4, 1982, Durst notified the Navy that the additive work items were having an adverse impact on the project.

Throughout the period of performance, Triax experienced difficulties with hired laborers, such as inefficient, inexperienced crew, a high rate of attrition, and labor shortages. A thorough review of the record, however, indicates that Triax's difficulties in this area are customary and

typical in the construction industry. Triax hired and paid its workers in accordance with the Fair Labor Standards Act and the then-existing Davis–Bacon wage rates.

At times, submittals to the Navy and installations under the contract were rejected, such as shop drawing submittals for kitchen cabinets, wood windows, wood doors and medicine cabinets. While rejection of these drawings caused delays under the contract, such delays were minimal in the realm of construction contract work. These delays did not significantly affect Triax's performance on the Forms A and Forms B work items.

As a result of the Form A and Form B changes, Triax experienced difficulties in scheduling labor and production. The enormous quantity of changes and the short period of time in which Triax had to prepare for them prevented Triax from organizing the job in the most efficient and cost-effective manner. During early contract performance Triax's managers had difficulties with start-up operations as a result of numerous work items added at the outset of demolition. Triax's initial work force was inadequate to deal with the total quantity of work that the Navy required. The Navy informed Triax that its work force must be expanded.

Throughout the course of contract performance, Triax performed a total of approximately 22,000 Form A and Form B additional work items. Triax and the Navy negotiated monetary compensation for the 22,000 Form A and Form B changes by using the unit price list applied to prices under the basic contract. Thirteen of the 41 contract modifications involved Form A and B work items. The period of performance was extended by 100 days. Triax completed work under the contract 5 months early.

Triax and the Navy negotiated material and labor amounts for the changes, resulting in numerous bilateral contract modifications. Typically, when the Government initiates execution of a bilateral, or two-party, modification, it sends two unsigned copies of that modification to the contractor for signature. Upon signing both copies, the contractor returns one to the contracting officer for signature and execution. The contracting officer, therefore, is the last to sign the bilateral modification, and it is this signature that finalizes the modification. This procedure prevents a contractor from changing language in a modification to which the Government would be bound by prior signature.

Unlike the customary procedure described above, the contracting officer in this case signed the modifications *before* Triax personnel affixed its signature. This erroneous method gave Triax personnel the opportunity to alter the documents' language, to which the Government would be bound by prior signature. The first six modifications to the contract were executed in this manner. Fortunately for the Navy, Triax personnel did not change the language of those modifications.

The Navy's faulty procedure in executing bilateral modifications presents a controlling issue of this case with respect to contract modification 7. Again, the Navy had already signed modification 7 when it first reached Triax for review and signature. The language of the modification included a waiver clause, stating:

Acceptance of this modification by the Contractor constitutes an accord and satisfaction and represents payment in full (for both time and money) for any and all costs, impact effect, and/or delays arising out of, or incidental to, the work as herein revised and extension of the contract completion time.

Upon receipt of the modification, Roger Durst of Triax deleted this language and added the following statement:

The Contractor reserves the right to impacts and delays as they may occur as a result of this change. The cost of these impacts and delays shall be submitted as soon as they become calculable.

Once the above was added, Durst signed the modification, on July 9, 1983.

A second modification 7 was executed on August 22, 1983. This time, however, Kay Barbre of Triax and the Navy both signed the modification with the original language intact. That language called for a waiver

of any impact and delay claims, as set forth *supra.*

The parties disagree as to which modification 7 is legally binding, and the exact meaning of the language therein. Triax submits that the earlier modification 7 is valid and that it does not preclude a claim for impact and delay damages caused by Form A and B changes. The Navy argues that the later modification 7 is valid, and that the language therein expressly waives Triax's right to claim damages for Form A and B work items. This raises significant legal issues involving accord and satisfaction and the parol evidence rule. Both issues have been extensively briefed.

On April 1, 1985, Triax submitted a claim to the contracting officer charging that the Navy had made a cardinal change to the contract and requesting $2,852,115.12. This claim was signed and certified by Ronald Carter of Triax, who, at that time, was Secretary and legal attorney. The claim was denied by the contracting officer on September 17, 1985.

Subsequently, on June 19, 1987, Triax submitted a second certified claim to the contracting officer requesting $4,154,737 for breach of warranty of the plans and specifications for the subject contract. This claim was certified by William Simmons of Triax, who at the time was Financial Vice President of the company.

During trial the Court, *sua sponte,* raised the question of claim certification and requested the parties to brief the Court on that issue. At the conclusion of trial and in compliance with the Court's requested schedule, briefs were filed.

Defendant now asserts that the first claim, certified by Carter, is ineffective because Carter was not an appropriate official to sign the claim under the Federal Acquisition Regulations (hereinafter referred to as "FAR"). The effect of this invalid claim, argues defendant, is that any interest accruing to plaintiff should begin to run as of the date of the second, unchallenged certified claim, on June 19, 1987. In the alternative, defendant asserts that, should the first claim be held as valid, then that part of Triax's second claim, which for the first time requests compensatory damages, should be denied since Triax knew or should have known of these damages at the time the first claim was prepared.

Defendant does not challenge the validity of Triax's second certified claim dated June 19, 1987. The position of both parties regarding this claim is that the certification requirements of the Contract Disputes Act (hereafter referred to as "CDA") and FAR have been met.

For the following reasons, however, the Court finds that neither claim was properly certified and the Court is without jurisdiction to hear plaintiff's claim.

*Discussion*

A Government contractor seeking relief in the Claims Court must first present its claim to the contracting officer for final decision. If a contractor's claim exceeds $50,000, it must be certified in accordance with the Contract Disputes Act, 41 U.S.C. § 605(c)(1) (1982), and applicable FAR provisions.

As Judge Nettesheim of this Court stated in *Drake v. United States,* 12 Cl.Ct. 518 (1987), "[t]he fact that a contracting officer has rendered a final decision on an [improperly certified] claim is of no consequence in respect to the claim's validity. The contracting officer has no authority to waive a requirement which Congress has imposed." *Id.* at 520, *citing United Constr. Co. v. United States,* 7 Cl.Ct. 47, 51 (1984).

The Court of Appeals for the Federal Circuit has repeatedly recognized that proper certification of a contract claim is essential to the Court's jurisdiction. *See Ball, Ball & Brosamer, Inc. v. United States,* 878 F.2d 1426 (Fed.Cir.1989); *T.J.D. Services, Inc. v. United States,* 6 Cl.Ct. 257 (1984); *Palmer & Sicard, Inc. v. United States,* 4 Cl.Ct. 420, 422 (1984); *Conoc Constr. Co. v. United States,* 3 Cl.Ct. 146, 148 (1983); *Metric Constr. Co. v. United States,* 1 Cl.Ct. 383, 389 (1983).

While the CDA merely requires that "the contractor shall certify", the FAR as it is incorporated into the General Provisions of the Triax contract specifies which repre-

sentative of the contractor must certify. *Ball, Ball & Brosamer, supra,* 878 F.2d at 1428.

FAR clause 33.207(c)(2) calls for the following:

Contractor Claim Certification

(2) If the contractor is not an individual, the certification shall be executed by—

(i) A senior company official in charge at the contractor's plant or location involved; or

(ii) An officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs.

48 C.F.R. 33.207.

A number of cases have discussed what constitutes proper claim certification under the FAR. In *Romala v. United States,* 12 Cl.Ct. 411 (1987), this Court held that a claim exceeding $50,000 signed by the contractor's attorney was not properly certified where the attorney did not hold a position in the company. *See also T.J.D. Services, Inc.,* 6 Cl.Ct. at 261–62. The Court in *Drake, supra,* found that plaintiff's representative, who was "responsible for the scheduling, coordinating, and monitoring of the overall project" was not the appropriate official to certify the claim. *Id.* at 519. Since plaintiff's representative who signed the claim was not a senior company official nor an officer or general partner of the firm, his certification did not meet the requirements of FAR 33.207(c)(2).

After the trial of this case, the Court of Appeals for the Federal Circuit rendered a decision which strictly construed the language of FAR 33.207(c)(2).

In *Ball, Ball & Brosamer, Inc., supra,* the court held that a senior cost engineer responsible for the contractor's financial accounts and claim preparation was not the proper individual to certify the contractor's claim against the Government.

In this regard, the court held:

[The official certifying the claim] does not satisfy either of the requirements of subsection (c)(2). Even assuming that the chief cost engineer was a "senior company official" within the meaning of

that provision, he was not "in charge at the contractor's plant or location involved" (subsection (c)(2)(i)), and he did not have "overall responsibility for the conduct of the contractor's affairs" (subsection (c)(2)(ii)). The fact that Mr. Meek [the certifying official] may have had "authority to sign and certify claims on behalf of the corporation," as the corporation's president stated he had, does not establish that Mr. Meek comes within either of the two categories of persons the regulation authorizes to execute certifications of claims.

*Id.* at 1428.

Rule 12(h)(3) RUSCC provides:

Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.

Even if the parties remain silent, a trial court " * * * is obliged to notice on its own motion the want of its own jurisdiction * * *." *Hambsch v. United States,* 857 F.2d 763, 765 (Fed.Cir.1988); quoting 13 C. Wright, A. Miller, & E. Cooper, *Federal Practice & Procedure: Jurisdiction 2d* § 3522 at 69–70 (2d ed. 1984).

Ronald Carter, secretary of the company and attorney of Triax at the time he signed the first claim, was not in charge at the contractor's plant, even though he may have been considered a senior company official at the time. Plaintiff's statement that Carter was the corporate secretary and had overall responsibility on the claim when he certified it does not establish that FAR requirements that he have "direct responsibility over the project" were met. Indeed, plaintiff does not dispute defendant's statement that during the course of contract performance, Carter never had any dealings with Navy personnel. There is no testimony that Carter even visited the worksite, nor did anyone from Triax ever represent that Carter possessed any particular authority on behalf of Triax.

William Simmons certified Triax's second claim on June 19, 1987. As financial vice president, Simmons was a senior company official. Nevertheless his certification does not meet the requirements of the FAR

because the record reveals that he was not in charge at the contractor's plant during contract performance. Nor did he have overall responsibility of the contractor's affairs at the time of certification.

Regarding Simmons' involvement with operations under the Wherry Housing contract, he testified as follows:

Q. Are you familiar with the contract requirements?

A. Yes, but not in detail that our construction people would be.

\* \* \* \* \* \*

Q. What efforts did Triax make to try to keep track of those costs?

A. Mr. Despain and I, the controller, we visited the job. We went out and observed what was happening, as I mentioned the one observance that I made.

\* \* \* \* \* \*

Q. You're a general partner in the company, is that correct?

A. Yes, I am.

Q. What is your responsibility as vice president of financial affairs?

A. My responsibilities are all banking relationships, in charge of all accounting, all relationships with the auditors, I'm responsible for seeing that payrolls are—I sign all the certified payrolls after reviewing the payroll data and everything prepared by my accounting clerk and everything that relates to the accounting function and financial nature of the company.

Q. What overall responsibility did you have, if any, for the conduct of the contracts [sic] affairs, that is the Memphis project?

A. The Memphis project, Your Honor, my duties now are much more expanded than when the Memphis project was going on. At that time I still had the, all the accounting responsibilities and financial relationships with the bank, but *I had no direct authority as far as managing the job or anything like that.*

Q. How were you involved with the job?

A. My involvement was mainly in trying to keep track of costs * * *.

The above excerpts from the transcript of Simmons' testimony clearly define his responsibilities on the Wherry Housing project. While Simmons may have visited the job site on occasion, he was there for budgetary purposes rather than as one in charge at the plant.

The certification of the second Triax claim by Simmons renders it improperly certified under FAR requirements that a senior company official in charge at the contractor's plant must certify a contractor's claim.

Simmons' undisputed testimony is the best evidence of his responsibilities during the course of contract performance. The record is clear that Simmons was strictly in charge of financial matters, rather than in charge in a supervisory capacity on the job site.

The Court of Appeals for the Federal Circuit's pronouncement in *Ball, Ball & Brosamer* holds that a contractor's representative in the official capacity as Simmons is not the appropriate person to certify the claim.

Since under the controlling decision of *Ball, Ball & Brosamer,* both claims are improperly certified, the Court in this first instance lacks jurisdiction to hear the case. Other issues involving delay impact costs and damages cannot properly be decided by the Court.

*Conclusion*

The Court, *sua sponte* and pursuant to Rule 12(h)(3) RUSCC, must, therefore, direct the Clerk to dismiss the action for lack of subject matter jurisdiction. No costs.