The TRIAX COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 626–85C.

United States Court of Federal Claims.

Aug. 6, 1993.

Denver C. Snuffer, Jr., Salt Lake City, UT, for plaintiff. Timothy Miguel Willardson, The Triax Company, of counsel.

Sharon Y. Eubanks, U.S. Dept. of Justice, Washington, DC, for defendant. Stephanie Cates–Harman, U.S. Dept. of the Navy, of counsel.

## BENCH OPINION

SMITH, Chief Judge.

On April 28, 1993, after more than two weeks of trial, in both Salt Lake City, Utah and Washington, D.C., the court outlined to the parties its decision in this matter. Prior to the trial, both parties had indicated a desire that the court issue such a ruling at the end of the trial. The court felt, after reviewing the transcript of the bench comments, that a written version of them would be more helpful than a mere order formalizing the transcript as the judgement of the court. It therefore issues this bench opinion. For the factual and procedural history of this case, see Judge Napier's order of dismissal at 17 Cl.Ct. 653 (1989) and Chief Judge Smith's opinion on plaintiff's Motion for Reconsideration at 20 Cl. Ct. 507 (1990).

The Triax Company was a good contractor that tried its best on this contract. Plaintiff's witnesses, who were also its employees for the most part, were credible. While a number of them had a financial stake in the case's outcome, this did not, in the court's view, affect their veracity. The most significant weakness in their collective testimony was that they only had a partial view of the facts. They saw the large number of Form A and Form B changes or items, and they saw that the contract was losing money. They could not, however, show the court the causal connection. In fact, based on the testimony of plaintiff's witnesses, Mr. Kay Barbre and Mr. Jack Bergovoy, both highly credible individuals, the court could see that the Form A and Form B changes were probably not the primary reason that the plaintiff lost such a large sum of money.

The court is convinced that the loss suffered by plaintiff was a real and devastating financial loss. There is no reason to disbelieve it was, as plaintiff claims, in the two point eight million dollar range. The court, however, has not been persuaded that the loss was solely, or even primarily, the result of the impact of the Form A and Form B changes. The plaintiff has thus not met the burden of proving its case.

While the court need not determine what actually caused the loss, as long as it was not caused by the impact of the changes introduced into the contract by Form A and Form B, there is some evidence of the

cause. Evidence introduced by the government as well as some introduced by the plaintiff, tended to support the inference that early Triax management problems were the principle culprit in creating the inefficiency. This inefficiency existed in responding to both the lump sum modifications and the Form A and Form B work, as well as the work required in the original contract.

There was also some evidence that suggested that the lump sum modifications, which Triax raised no claim for, were partially responsible for the loss. This may have occurred because of managements' inability to effectively deal with these changes, as noted above, and/or plaintiff's underbidding of these changes. It should be noted that the lump sum modifications added significantly more dollar value to the original contract price than the Form A and Form B changes. The lump sum modifications added $1,308,671 to an original total contract amount of $4,688,400. While the Form A and Form B work added $523,523. It is thus counter-intuitive that the lump sum modifications created none of the impact complained of while the Form A & B work created all of it.

Finally, there was also some evidence that Triax underbid the labor component of the original contract. Triax could not adequately rebut this since the bid documents had all been destroyed prior to the claim. While there was probably more than one cause of the loss, it was Triax's contention throughout this case that only a total cost claim was possible and that all of the claimed two point eight million dollar loss resulted from impacts caused by the changes from the Form A and B work. Triax did not, and the court believes, could not prove this contention.

Certain other facts further confirm this view. Several of plaintiff's key witnesses, including Mr. Lyle Goodwin, Mr. James R. Vallett, Mr. Roger Durst, Mr. Kay Barbre, and Mr. Jack Bergovoy, pointed to the overwhelming number of the Form related changes. They gave, and apparently had, the impression that the changes were an avalanche coming in every 15 minutes or

so. As a result, they felt inundated and unable to schedule the work in any organized way. Their computer person appeared incapable of any useful response to this problem. However, logical analysis undercuts the objective reality of this perception.

The changes came in at an average of about one Form A and one Form B per day. Form A's had between 10 and 100 items per Form. Form B's had about 2 items per Form. Even this may overstate the impact since a number of the individual items were small or were more of the same type of work already in the original contract. The average Form A and B type item was about $24 with about 30 items per day, or about 46 per unit. (The total number of items (22,175) divided by the number of calendar days (730) spent completing the units—from November 1, 1982, the date of the commencement of the demolition work within the units, to October 29, 1984, the date the last unit was completed). An analogy to this dispute is one party saying, "I am overwhelmed by the 150,000 words I am inundated with each morning!" and the other party saying, "Yes, but it is still only one newspaper!" While plaintiff's position is more substantial than my analogy, the reality is closer to the defendant's position.

For each of the 486 housing units there was one Form A provided by the government to the contractor at the time the contractor took possession of the unit for renovation. An outdoor Form A was also provided covering the whole building which might contain a varying number of units. There were 111 separate buildings. The Form B's were produced either as the renovation proceeded and new work came to light or upon the request of the government inspector after the work was completed. There were about 2 Form B's per unit. The most common example of a Form A item, as discussed at trial, was a new crack that needed repair or a new plumbing mechanism or fixture. The most common trial example of a Form B item was additional carpentry and plaster work needed because of the discovery of termite damage

after plaster was removed from a wall for base contract purposes.

The Form A's contained additive work that was discovered by a government inspector prior to the contractor being allowed to start renovation. There was a significant amount of dispute over whether these added renovations had been omitted from the original contract because of sloppy government architectural work, because of normal and expected wear and tear from military usage, or because they were additions the government only felt it could afford after contract award in light of the lower than expected bid. The court believes that the reason for the felt need for these Form A changes was irrelevant to this case. The issue here is not an arbitrary and capricious review of the contracting officer's decision, but rather an analysis of whether the changes caused the contractor impact dollars over and above the amount paid for the Form A and Form B materials and labor.

The court spent some time reviewing the Forms A and B, since it was important to plaintiff's contentions. And, while it is undoubtedly true that they had some negative impact, plaintiff has not proven that its magnitude was anywhere near the claimed amount or even that it was not fully compensated by the amount paid plaintiff for the Form A and Form B changes.

Another logical problem with plaintiff's theory is brought out by the excellent testimony of defendant's witness, Mr. James McKay, which held up fully to Mr. Snuffer's rigorous and expert cross-examination. Mr. McKay and his report show that plaintiff's contention that the Form A and Form B changes made it impossible to schedule the work and created tremendous impact costs for the contractor are inconsistent with the relatively smooth flow of the last 75 percent of the work on the project under Mr. Bergovoy's and Mr. Barbre's leadership.

The fact that earlier management, Messrs. Durst, Vallett and Goodwin, were competent and perhaps very good construction managers, really is not relevant to the court's conclusion. Plaintiff seemed to place significant reliance on a kind of theoretical analogue to the business records exception to the hearsay rule. Under their theory, Triax was a very competent contractor that made money in the past, and its managers were experienced and competent project managers who had run projects that made money. Therefore, the fault in this contract must lie with the Form A and Form B system, the key variable.

Even assuming those premises were proven with the amount of evidence needed in a judicial fact finding (and that would be almost impossible when dealing with such propositions for any company or human beings on such a broad set of conclusions), it would not prove that plaintiff and its employees did not make significant mistakes this time. Using such a premise in the criminal context shows its weakness. Under the premise, if a person has never committed a crime, then that is strong evidence that they did not commit one this time. In certain narrow contexts, like malpractice litigation, dealing with a narrow range of conduct, the approach has some validity. However, the fact that one has managed ten or fifteen or even fifty construction projects with a profit is of little probative value as to whether the next one lost money because of the manager's decisions. There are many orders of magnitude between the complexity of the management of a construction project, and whether individual X did a specific wrong act on a specific occasion at issue.

There are several factual issues raised by the parties that the court thinks it useful to dispose of here. Contrary to the government's position, plaintiff's failure to make the site visit or a site visit of more than two units was not a contributing cause of its losses. Even Mr. McKay admitted that the site visit was somewhat of a red herring. None of the things seen on a site visit would have helped plaintiff's personnel to anticipate the Form A and Form B work. It should be noted that Mr. McKay's testimony on this issue strongly reinforced his credibility in general.

The government's chief factual witness was Mr. Kenneth Fulmar. Plaintiff blamed him for a number of the difficulties relating to the impacts caused by the Forms A and B. It appears to the court that if Mr. Fulmar was a credible and truthful witness it is very important and critical evidence against plaintiff's claim. The court, indeed, found Mr. Fulmar a highly credible witness. After several days of his testimony under intense cross examination, both at this trial and through transcripts at the previous trial, the court found no reason to doubt Mr. Fulmar's truthfulness. While the government would prevail without this fact for the other reasons previously cited, Mr. Fulmar's highly credible testimony strongly supports the court's conclusions. It also supports the proposition that the Navy did nothing to create the impact plaintiff complains about. In fact, the testimony and evidence does support the fact that the Navy made a number of contract concessions that reduced the impacts that might otherwise have been created by the Form A and B changes.

Although whether Modification 7 was an accord and satisfaction is a closer call, the evidence tends, perhaps by a preponderance, to show that at the time immediately before and after the signatures of Modification 7 plaintiff did not intend to resolve the impact issue on the Form A and B work. While Mr. Barbre's testimony on this issue was a little confusing, and the transaction itself was confusing, the evidence fails to show the intent that the government needs to establish in order to show that an accord and satisfaction occurred or was intended to occur.

With respect to the shop submittals and the various quality problems that were raised by the government as possible causes of the impacts and delays, there was no proof that they delayed or negatively impacted the project in any significant way. Likewise, there is no indication that the occurrences of drunkenness, absenteeism and stealing on this project were any more frequent than on any other similarly large construction project. No significant impact was proven to have come from these causes.

The court's decision today addresses plaintiff's initial claim of $2,852,115. The court need not reach Triax's second claim in the amount of $4,154,737 because the underlying liability dispute is the same. However, the court does have its doubts as to legal entitlement to the amounts sought in the second claim over and above the $2.8 million figure on an additional basis. The additional amount in the second claim is based on damages attributable to lost bonding suffered by Triax. Plaintiff alleges that as a result of the losses it suffered on the instant contract, its bonding was cancelled. Without bonding it could no longer operate. As a result, plaintiff was forced into a joint venture. According to plaintiff's witnesses, it put up all the effort and its partner only supplied the bonding. The profits were split 50–50. Plaintiff claims that the 50% of the profits it did not receive from its profitable jobs after the loss of bonding is an item of damage attributable to the government's action and hence compensable. The court tends to believe that such damages are too speculative to be recovered, however, the issue need not be addressed in light of the court's opinion in this case.

As plaintiff has not met its burden of proof, the court has no alternative but to dismiss the plaintiff's complaint.

No costs.