**ADVANCED MATERIALS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 94–621C.**

United States Court of Federal Claims.

Sept. 6, 2002.

Donald Little, Park City, Utah, for plaintiff.[1]

Lauren S. Moore, with whom were Stuart E. Schieffer, Acting Assistant Attorney General, David M. Cohen, Director, and Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

## *OPINION*

SMITH, Senior Judge.

### I. Introduction

Plaintiff Advanced Materials, Inc. (the "plaintiff" or "AMI") filed a complaint, since amended, against the United States (the "defendant") alleging that the defendant owes it $46,960.22 for costs related to a contract with the U.S. Army ("Army"). On May 17, 2000, the court granted defendant's motion to dismiss in part relating to a breach of contract claim. *Advanced Materials, Inc. v. United States*, 46 Fed.Cl. 697 (2000). This opinion comes after a 4–day trial was held in New Orleans, Louisiana, on the remaining termination for convenience claim and after a thorough consideration of the briefs. Because the plaintiff has failed to meet its burden of proof that it is entitled to recover any costs, the court finds for the defendant for the reasons enumerated below. The clerk is directed to enter final judgment pursuant to this opinion.

### II. FACTS [2]

On September 26, 1990, the U.S. Department of the Army awarded a cost plus fixed

---

1. Mr. Little was a founder and an officer of Advanced Materials, Inc.

2. These facts are taken largely from *Advanced Materials, Inc. v. United States*, 46 Fed.Cl. 697 (2000).

fee contract, Contract No. DAAA60–90–C–0111, to AMI for the design and fabrication of 56 backpacks to keep troops cool under extreme temperatures. The Army terminated the contract for convenience by letter on June 10, 1992, effective May 27, 1992. On July 10, 1992, the termination contracting officer (TCO) told AMI that it could submit vouchers for allowable costs until November 30, 1992. On January 13, 1993, AMI submitted a settlement proposal to the TCO requesting $10,500.70, which AMI was paid on Jan. 27, 1993, subject to later audit. An audit of AMI performed by the Defense Contract Audit Agency ("DCAA") for Fiscal Years 1991 and 1992 resulted in a referral to the Defense Criminal Investigative Service ("DCIS") in 1993 for a fraud investigation. A summary report dated May 15, 1996 from the DCIS indicated that they were planning to close the investigation in mid–1996.

Settlement of the termination was never officially completed as the two sides bickered over disposal of the remaining government property. On April 11, 1994, AMI submitted a public voucher to the TCO for $18,002.00 for "the total costs and profits" due AMI for the contract. The TCO informed AMI that the voucher period had ended in November 1992, and she would not accept any new vouchers.

AMI submitted a "claim" by letter on June 27, 1994, for the $18,002 previously mentioned plus $3,500 in additional legal and settlement costs for a total of $21,502. AMI presented the letter to the TCO as a "claim for equitable adjustment in the contract funding and price for this contract." AMI included a "certification" that the "claim is submitted pursuant to the Contract Disputes Act," and requested a resolution of the claim within sixty days. The TCO advised AMI on July 18, 1994, that the settlement amounts were not in dispute at that time. In a subsequent letter, the TCO noted the discrepancy between the amount in AMI's "claim" versus its settlement proposal, and stated that because the contract had been terminated for convenience, not breached, all claims must be merged within the termination settlement proposal.

On September 6, 1994, AMI wrote the TCO and notified her that because she had not resolved the claim within sixty days, AMI deemed it denied. AMI also informed the TCO that if she did not produce a final decision within fifteen days from the date of the letter, AMI would file a claim in the United States Court of Federal Claims. AMI filed this action on September 21, 1994. At trial, the parties stipulated that the government had paid AMI a total of $270,031 for the contract.

In June 1996, the court temporarily stayed this case while AMI litigated a companion case before the Armed Services Board of Contract Appeals. The litigation resumed in this court in June 1998.

### III. DISCUSSION

#### 1. Jurisdiction

In a previous ruling on defendant's motion to dismiss, the court found that the plaintiff had submitted a valid claim to the contracting officer related to its termination for convenience and that the failure of the contracting officer to respond within 60 days constituted a denial. *Advanced Materials, Inc. v. United States,* 46 Fed.Cl. 697 (2000). Thus, under the Contract Disputes Act, plaintiff's claim is properly before the court. *See* 41 U.S.C. § 601 et seq. (1987 & 2002 Supp.)

#### 2. Standard of Review

█ Plaintiff has the burden of proving its allowable costs by a preponderance of the evidence. *See Ryan–Walsh, Inc. v. United States,* 37 Fed.Cl. 639 (1997) (*citing Delco Elecs. Corp. v. United States,* 17 Cl.Ct. 302, 319 (1989)). As this court has articulated previously, "[W]hen damages are sought, the contractor must prove the amount of its damages 'with sufficient certainty so that the determination of damages will be more then mere speculation.'" *Malissa Co., Inc. v. United States,* 18 Cl.Ct. 672, 674, *quoting Willems Indus., Inc. v. United States,* 155 Ct.Cl. 360, 376, 295 F.2d 822 (1961), *cert. denied,* 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962). In a case such as this, where plaintiff seeks costs which have been

disallowed by a government auditor, it is incumbent on the plaintiff to produce probative evidence as to the allowability of the costs in order to recover. *See Roberts v. United States,* 174 Ct.Cl. 940, 949, 357 F.2d 938 (1966).

### 3. Termination for Convenience

#### a. Has AMI Been Paid All that It Is Due?

A threshold issue for the court to consider is the government's contention that AMI has been fully paid on the contract. During contract performance and the settlement phase, AMI submitted 24 vouchers to the government for reimbursement for costs associated with this contract. The final voucher that was submitted, voucher number 24, indicates that AMI was paid $10,500 per its termination settlement proposal for a grand total of $270,817.26. The parties stipulated at the beginning of trial that AMI was paid just less than that amount, namely $270,013.[3] The government contends that these 24 vouchers are conclusive proof that AMI has been fully paid under the contract according to its own requests and that no further funds are due.

Plaintiff disputes the government's contention alleging that the government has yet to pay upwards of $38,000 to AMI. Although plaintiff's amended complaint seeks $46,960.22, the actual recovery figure has been a moving target. Plaintiff conceded at trial that the cost limitation clause in the contract of $308,000 caps any recovery at roughly $38,000. Tr. Trans. at 535. In addition, plaintiff further testified that his recovery was limited to $18,002 as per AMI's submission via voucher 24. Tr. Trans. at 557. Plaintiff pointed to the bottom of voucher 24 where it states that the voucher seeks $18,002 for "current G & A plus profit due AMI for years '90, '91, and '92." [4] Def. Ex 28.

Although plaintiff claims that the government owes AMI money, plaintiff did not pro-

duce any evidence at trial about unpaid direct or indirect costs. Rather, he spent the vast majority of his time challenging the findings of a government auditor relating to costs that were paid but later disallowed. For example, the DCAA disallowed the following costs: the salary of an AMI employee; rental costs; vacation costs; automobile depreciation costs; indirect labor; and the appropriate General & Administrative ("G & A") rate. The DCAA reports concluded that AMI was overpaid $23,000 on these disallowed items.

As defendant brought out on examination of the DCAA auditor, in a typical cost-plus-fixed-fee type contract the government pays the vouchers as submitted by the contractor and then audits the vouchers later. This case is no exception to that practice. This case is a dispute over costs that were paid and later disallowed that plaintiff believes decreased the overall G & A rate AMI was paid. Plaintiff's counsel admitted as much on cross-examination when he said that this case was not about unpaid costs but a dispute over the G & A rate. *See* Tr. Trans. at 557. Defendant also correctly noted in its post-trial brief that "AMI has not identified any additional G & A costs to the court; rather, AMI simply disagrees with DCAA's treatment of specifically identified claimed costs, which had not been included on AMI's general ledgers." Def. P. Tr. Br. at 6. The court agrees with the government's position. Thus, plaintiff's complaint boils down to a dispute over the G & A rate.

#### b. Applicable G & A Rate

Because the plaintiff has not produced any evidence about unpaid direct costs, the court now turns to plaintiff's contention that the DCAA auditor's disallowance of certain costs decreased the G & A rate below what AMI should have recovered. The theory of plaintiff's case seems to be that if it can prove to the court that these costs were improperly

---

**3.** The unexplained discrepancy between the stipulated amount and the amount listed on Voucher 24, while curious, is not relevant to the court's disposition.

**4.** G & A costs are expenses that are necessary for the overall operation of the business, for example the cost of management employees, legal and accounting costs, personnel costs, public relations costs, business taxes, and are not specific to a particular government contract.

disallowed, then AMI can recover because its G & A rate will be higher. To persuade the court that these disallowances affected the G & A rate, plaintiff must first show that the costs were reasonable, allocable and allowable under the contract and the relevant FAR sections; and secondly, if they were allowable, that the disallowances decreased the G & A rate.

Plaintiff has presented to the court a confusing assortment of G & A rates that it apparently believes all could be correct. Plaintiff's pre-trial brief sought G & A rates of 60 percent for 1991 and 84 percent for 1992. Plaintiff's post-trial brief contains a number of recovery scenarios using different G & A rates. The first scenario puts the G & A rates at 72.5 percent for 1990, 57 percent for 1991, and 84 percent for 1992. The second scenario sets the G & A rate at 72.5 percent for 1990, 57 percent for 1991, and 60 percent for 1992. The third scenario sets the G & A rate at 41 percent for 1990, 57 percent for 1991, and 60 percent for 1992.

Defendant has moved to strike plaintiff's submission of the three recovery scenarios and accompanying affidavits of Mr. McCauley[5] submitted in post-trial briefs as a violation of the Federal Rules of Evidence 702 and 403. Defendant argues that the submissions are untimely, prejudicial, without foundation, and inherently unreliable. The court notes that it is highly irregular to submit new expert analysis of evidence in post-trial briefs filed after the trial was completed. While the court allowed Mr. McCauley to testify as an expert, the court did not consent to allowing him to submit affidavits and new analysis to the court after the completion of trial. The trial is where evidence and expert analysis is introduced as part of the adversarial process. Here, defendant did not have the opportunity to cross-examine Mr. McCauley on his affidavit and accompanying evidence in the post-trial brief, which forms the basis for the various G & A recovery scenarios. This prejudices the defendant. Moreover, as defendant points out, it is difficult for the court to assign credibility or lack thereof, based on the information submitted in plaintiff's post trial brief, because the court is unsure of the origin and underlying analysis. For those reasons, the court assigns little weight to this information and finds itself in agreement with the defendant that this evidence is improperly before the court.

Plaintiff believes that "[b]ased upon any one of the scenarios above, AMI is entitled to the difference between the stipulated amount the parties agreed was paid (approximately $270,000) and the ceiling price of the contract of $308,359 leaving a minimum difference available under any scenario in the amount of $23,561 approximately and a maximum amount of $38,359. AMI believes the accurate rate for 1992 is 84% and AMI believes it is entitled to the maximum amount under the contract of $38,000." Pl. P. Tr. Br. at 4.

Defendant argues that plaintiff is precluded from recovery because AMI was paid for its claimed G & A rates for Fiscal Year 1991 ("FY") and FY 1992 at a rate certified by a company official as required by 48 C.F.R. § 52.252–4 (1994). Mr. Karl Hoeffer, AMI's general manager, certified in 1993 that its overhead rates for FY '91 and '92 were 51.06 percent and 63.95 percent, respectively. *See* Def. Ex. 24. The government also noted that AMI's termination settlement proposal, also certified by Mr. Hoeffer, stated that "AMI was overpaid in G & A expenses for FY 1991, in the amount of $5,584.00." Def's. P. Tr. Br. at 4. In addition, the $10,500 paid by the government to AMI as part of the settlement proposal applied a G & A rate of 64.88 percent for FY '92, higher than the rate later certified by AMI itself! The government argues that no additional indirect costs or rates are valid because they have not been certified. In addition, the government argues that the DCAA auditor's cost disallowances were valid determinations and should be upheld by the court.

Audits for FY '91 and '92 were conducted by DCAA in 1993 and 1994. These audits questioned costs for FY '91 and FY '92 that were paid to AMI. After disallowing a number of costs, the audit reports concluded that

---

5. Mr. McCauley testified for the plaintiff as an expert witness. He served as the chief financial officer for Rolls Royce Gear Systems, Park City, Utah, at the time.

AMI had been overpaid $23,000. The record shows that as part of the settlement agreement following the termination AMI itself certified to the government that the correct G & A rates for 1991 and 1992 were 49.55 percent and 64.88 percent, respectively. *See* Def. Ex. 17. These G & A rates differ from G & A rates previously generated by AMI for the same years. *See* Def. Ex. 24. After conducting its audit, the DCAA established the G & A rate at 57 percent for 1991 and 60 percent for 1992.

DCAA audits are designed to ensure that costs being paid by taxpayers are allowable under the particular government contract at issue. In government accounting, a contractor's total reimbursable cost is the sum of its allowable direct and indirect costs. Expenses that are specific to a particular contract are categorized as direct and costs that go to operate the overall business are categorized as indirect and are spread over all of the contracts that a company may have with the government. As demonstrated by this case, the allocation of indirect costs to a particular contract can be a complex process that is full of pitfalls for the inexperienced contractor. G & A costs are indirect expenses that are not identifiable with any particular cost objective but that are necessary to the overall operation of the business. *See* 48 C.F.R. § 31.201–4 (1993). G & A includes the cost of management employees, legal and accounting costs, personnel costs, public relations costs, business taxes, and similar costs necessary for the conduct of a business. *See* Anderson, Accounting for Government Contracts, § 8.03[7] (1992).

Plaintiff challenged the DCAA audit report disallowances in the following areas: 1) the salary of Ms. Eugenie Dabezies; 2) the allowance of rental income not related to the cost of ownership of plaintiff's facility; 3) vacation time of Mr. Conrad Collins and Mr. Louis King; 4) vehicle mileage costs; and 5) indirect salary costs. The court addresses plaintiff's contentions seriatium.

### 1. Salary of Ms. Eugenie Dabezies

Plaintiff billed the government for the salary of Ms. Dabezies at $44.00 per hour and was paid this amount. When challenged by DCAA, plaintiff justified Ms. Dabezies salary by pointing to her title of president of the company and her assistance in the marketing and coordination of AMI's efforts to secure and execute various government contracts. The DCAA auditor concluded that based on her career experience and technical writing responsibilities at AMI that a wage of $14.00 was more appropriate. Defendant asserts that AMI was paid $44 per hour for Ms. Dabezies services pursuant to its voucher submissions, and as such was overpaid. In the FY '91 audit report, DCAA questioned $39,767 in direct labor costs for Ms. Dabezies, based on the differential between her salary as billed and the salary DCAA thought she was worth multiplied by the 1,312 hours she worked in FY '91.

At trial it became evident that the salary issue was immaterial to the dispute for two primary reasons. First, the evidence shows that Ms. Dabezies salary was not assigned to the contract at issue. All of her direct labor costs were assigned to another contract, Contract No. DAAA15–91–C–0080. In addition, plaintiff's counsel did not list Ms. Dabezies as among those employees who worked on this contract. Def. Ex. 36. Plaintiff's counsel listed himself, Mr. Karl Hoefer, Mr. Conrad Collins, Mr. Lee Kissner, and Mr. David Goldstein as the employees who participated in the management and operation of the subject contract, Contract No. 0111. As a result, the court issued a bench ruling during the trial that excluded the salary discussion as the court only has jurisdiction over the contract at issue. Tr. Trans. at 385. *See Triax Co. v. United States,* 28 Fed.Cl. 733 (1993).

Second, plaintiff claims that the G & A rate developed by DCAA was too low and did not accurately reflect AMI's actual incurred costs, and that the disallowance of Ms. Dabezies salary was part of the reason for this. This is simply not the case. The DCAA audit found that it would have been more appropriate to pay her $14 per hour, and thus AMI's G & A rate, had she been billed at this rate to this contract, would have been lower. For purposes of calculating the G & A rate, salary is included in the direct cost base, and thus affects only the denominator.

Thus, as the court noted during trial, regardless of whether Ms. Dabezies salary should have been $44, or $13 or $12 per hour, the G & A rate would not increase.

Plaintiff then argued that the court should consider two weeks of vacation time taken by Ms. Dabezies and allegedly billed to the subject contract as a direct cost. As illustrated above, the effect on the G & A rate would be adverse to plaintiff's case, therefore the issue, while puzzling, need not be considered.

### 2. Rent

█ The DCAA auditor deducted rental amounts from the G & A overhead pool of $6,790.00 in FY 1991 and $5,290 for FY 1992. Defendant argued that it was proper to do so because the facility rented by AMI was owned by Mr. Little's mother and that under the FAR, rental costs in excess of ownership cost between organizations under common control are not reimbursable. *See* 48 C.F.R. § 31.205–36(b)(3) (1994). DCAA allowed rental costs of $11,210 in each of those years because that is the cost of ownership as provided by AMI's certified public accountant.

At trial, the DCAA auditor testified that evidence of stock ownership in the entity is not the sole basis for determining common control. He noted that under the FAR the ability of one party to influence another is taken into consideration when evaluating the common control element. The DCAA auditor testified that no rental payments were made in 1990 and there was no written lease agreement. The first rental vouchers were submitted only after the subject contract was awarded on September 26, 1990. In 1991, AMI charged the government $18,000. In 1992, AMI charged the government $16,500.

Plaintiff argues that there was no common control or ownership because his mother was not listed as a shareholder on the corporation's articles of incorporation. Plaintiff's position is entirely based on the fact that his mother was not a shareholder of the corporation. Plaintiff cites two cases to support his position. According to the administrative judge in one case, "a finding of common control under the FAR should depend upon facts demonstrating direct or indirect control

over management and policies of the entity, whether by familiar influence, stock ownership, trust instrument, or otherwise, and Government contract cases finding common control also involves additional cost for the Government." *Appeal of West Tool & Mfg. Inc.,* NASA BCA No. 53–0891, 1993 WL 11679 (1993). In the other case involving two brothers involved in related businesses, the administrative judge found that no common control existed because "there is no control in fact by either brother over the other, by either corporation over the other, or by any outside source over both brother or both corporations." *Appeal of A.S. Thomas,* ASBCA No. 10745, 1966 WL 568 (1966).

The court agrees with the government that plaintiff was not held to the usual standards of commercial leasing because of his mother's ownership of the facility. Based on the evidence, it is clear that AMI enjoyed a payment flexibility unavailable to the great majority of government contractors. AMI did not have to execute a formal lease and did not pay any rent until it received a government contract. This preferential treatment is indicative to the court that plaintiff used a familial relationship to influence either directly or indirectly the terms of this rental arrangement, thus satisfying the test laid out in *West Tool.* In the court's view it was reasonable under this set of facts for DCAA to disallow these costs on the basis of the common control element.

### 3. Vacation Time

█ Plaintiff challenges the DCAA auditor's disallowance of vacation time charges of $4,560 for Conrad Collins and $1,063 for Louis King for FY '91. Plaintiff asserts that these costs are reasonable under the contract and not excessive based on the hours worked by these individuals. DCAA based its disallowance of these costs on AMI's own personnel policy which limits employees with less than five years of full-time employment to two weeks of paid vacation per year. DCAA concluded that Mr. Collins did not work full-time, having worked 1,801 hours out of a possible 2,080 hours. DCAA disallowed Mr. King's vacation time on the basis that he worked 181 days out of 260 in FY '91 and

was a contract laborer, not a permanent employee of the company.

Other than vague references, there was no direct testimony on this issue to support either position. As indicated before however, it is the plaintiff's job to persuade the court with probative evidence that supports its position on the issue of disallowed costs, and it has failed to do so on this issue. *See Roberts v. United States,* 174 Ct.Cl. 940, 949, 357 F.2d 938 (1966).

### 4. Vehicle Costs

 DCAA disallowed $2,489 for depreciation claimed by plaintiff for use of a 1991 Ford Explorer in the FY '91 audit and $4,300 in the FY '92 audit. DCAA reported that the vehicle was used for personal and business purposes and upon request AMI did not, or was unable to, produce a log to substantiate the business use of the automobile.

Plaintiff's testimony on this point was ambiguous at best. In an exchange with the court, plaintiff said "we provided documentation for mileage of a vehicle. I have a long diatribe with Mr. Bazzell in there where time—mileage costs to the time sheets does not relate to support the cost of reimbursement of that as a direct cost. Yet how would someone get from one facility to the other? Transport in space? But he wants some kind of support." Tr. Trans. at 420. As best as the court can understand it, being a person of this earth, plaintiff asserts that if he was able to show that he was on the job through his time sheets, then DCAA should have inferred that his vehicle brought him there, as opposed to a yet-to-be developed teleportation device. Apparently, DCAA was not satisfied with plaintiff's effort and the court finds itself in the same posture as plaintiff has failed to provide the court with any persuasive evidence to support its position.

### 5. Indirect Labor

AMI argues that it was a mistake for DCAA to reclassify $7,144 in salary for Mr. Collins from a direct cost to an indirect one, and that this mistake decreased the G & A rate. In support of its position, plaintiff states that time sheets were supplied to the government to demonstrate that the salary costs should have been direct because they are identifiable with a single cost objective. However, as the court noted in the case of Ms. Dabezies salary earlier in this opinion and at trial, direct salary costs are placed in the denominator for purposes of calculating the G & A rate and increasing the amount in the denominator can only have the effect of decreasing the G & A rate. If the court agreed with plaintiff's position, then the plaintiff would have succeeded in reducing the amount of its own claimed recovery. For that reason, the court finds this issue irrelevant to plaintiff's case.

### c. Alleged Outstanding Tax Liability

Defendant included in its reply brief a declaration of indebtedness from an employee of the Internal Revenue Service indicating that AMI is in arrears on its tax obligations. Because the court finds that plaintiff has failed to meet its burden of proof in this case, the tax issue is moot.

## IV. CONCLUSION

Having failed to provide the court with sufficient evidence to meet its burden of persuasion, the court finds on all issues for the defendant.

**IT IS SO ORDERED.**