**RYAN–WALSH, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 94–249C.

United States Court of Federal Claims.

March 17, 1997.

Paul W. Killian, Washington, D.C., for plaintiff.

Steven E. Gordon, Department of Justice, with whom were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, all of Washington, D.C., for defendant. Major Kelly D. Wheaton, United States Army, Arlington, Virginia, of counsel.

## OPINION

BRUGGINK, Judge.

This contract action is pending after trial. Plaintiff, Ryan–Walsh, Inc., contends that it

is entitled to an equitable adjustment under the changes clause on its contract to provide stevedoring services to the Government during the period surrounding Operation Desert Storm. The Government concedes that an adjustment is due, but only under the revision of prices clause of the contract, and contends that it has already overpaid Ryan–Walsh and thus is entitled to judgment on its counterclaim. The dispute concerns the proper amount of the adjustment and the precise factual circumstances on which the adjustment should be based. The case was tried in Washington, D.C. from February 4–12, 1997.

### Background

At the times relevant to this action, Ryan–Walsh, Inc. (RWI) was an Alabama corporation with its principal place of business in Mobile, Alabama. It was involved in the business of stevedoring at numerous ports around the United States. On June 3, 1988, the United States Department of the Army, acting through the Military Traffic Management Command (MTMC), issued a request for bids on a contract to provide stevedoring services at the Military Ocean Terminal for Sunny Point (MOTSU) in North Carolina. From MOTSU, the MTMC sends supplies, ammunition, and equipment to United States and North Atlantic Treaty Organization (NATO) military forces around the world. RWI has been the primary stevedoring contractor at Sunny Point since the facility opened in 1955, and has worked that port continuously since 1980.

Bidders on the proposed stevedoring contract were to submit proposals that, for most contract line items, contained commodity rate pricing,[1] based on government-furnished estimates of expected cargo volume. Other contract items not priced at the commodity rate were to be priced at hourly rates. On or about July 19, 1989, RWI submitted its Best and Final Offer (BAFO), in which it offered to perform the contract based on fixed unit prices with a stated profit margin equal to

---

1. A commodity rate is the price that the contractor charges for handling one unit of a designated commodity.

five percent of its anticipated direct labor costs, for a total estimated contract value of $9,633,648.03.[2] In August 1989, RWI was informed by the Contracting Officer (CO), Joseph Madison,[3] that its bid had been accepted by the MTMC. On September 25, 1989, contract number DAHC24–89–D–0008 was officially awarded to RWI to provide stevedoring and related terminal services at MOTSU from November 6, 1989 through November 5, 1991. The contract was ultimately extended to August 31, 1992, and was modified to include certain additional work performed at a commercial port in Wilmington, North Carolina (about 30 miles from MOTSU).

Typically, RWI would handle the loading and unloading of an average of less than one ship per month. This was most often the "Rover." Its arrival was known well in advance, as well as its cargo, making the process of unloading and reloading efficient. When a ship was in port, RWI would obtain the necessary work crews from the longshoremen's local union. Work was normally performed on an 8 a.m. to 5 p.m. schedule, although on occasion would involve overtime to 11:00 p.m. Typically, there was no more than one ship in port at a time. Under normal conditions, most of the stevedoring work experienced at MOTSU was automated, thus requiring fewer longshoremen.[4]

On August 12, 1990, the United States military commenced Operation Desert Shield, which involved the sending of a con-siderable amount of military weapons, equipment, ammunition, and other materials to Southwest Asia—primarily to Saudi Arabia—to respond to Iraq's military invasion of Kuwait. This mission was followed by Operation Desert Storm on January 16, 1991 (the combat operation), and Operation Desert Sortie on March 5, 1991 (the withdrawal operation). Because of the urgency and importance of these various "Desert Operations," RWI experienced a dramatic increase in the MTMC's need for its services at MOTSU[5] and an overall change in operations at MOTSU.

Among these resulting changes were a shift to "around-the-clock" activity, work on more than one ship at the same time, and the use of additional equipment[6] to perform the work required. During the peak times of this period, RWI worked simultaneously on up to six vessels. RWI also substantially increased the number of work gangs that it employed. Because of the lack of available qualified union labor in the area, these additional work gangs included many inexperienced employees. Moreover, the need for additional work gangs was necessary because much of the work was not containerized and thus could not be automated.

Also contributing to inefficiencies was the fact that the Government occasionally changed the schedules and priorities for work after other work had already been started by RWI. This was due, in part, to certain equipment arriving late at MOTSU

2. Although the total contract bid price was estimated (based on the commodity and hourly rates employed), the Government anticipated the total value of the contract, based on the rates bid, to be less than $10,000,000.00 for the two year contract period.

3. Mr. Madison served as the CO until his retirement in March 1994. Following his retirement, Christina Dossman took over as CO and she is presently the Chief of the Stevedoring Branch of the Acquisition Division at MOTSU. However, during the claims period Ms. Dossman served as a contract price analyst.

4. This work is characterized as "automated" because it involved the use of a large specialized crane to load and unload containers on and off a ship. The alternative method of shipping cargo is known as "breakbulk" cargo. Breakbulk cargo involves the use of forklifts, carpenters building wooden pallets and crating, and physical placement of materials. Longshoremen are utilized for both types of work, but more are required for breakbulk work.

5. As noted above, RWI was required to perform certain contract work at the commercial port in Wilmington, North Carolina. For ease of reference, all additional work referred to in this opinion as occurring at MOTSU also includes any additional related work performed by RWI at Wilmington.

6. Additional equipment was necessitated because not only were there more ships to load, but also because ships of different types than those originally anticipated by the contract were being used to meet the military's needs. The additional equipment primarily included lighting (for night loading), forklifts, and "yard hustlers."

for loading onto the ships that were already waiting in port. These waiting ships caused congestion that slowed the loading operations. Overall, it is not disputed that RWI experienced a dramatic increase in its absolute costs and a significant reduction in its productivity (and hence an increase in the cost per unit) during this period of increased activity.

Throughout the Desert Operations, the Government continued to pay RWI at the contract rate for unit-priced items of work, and reimbursed its direct cost items. RWI suggested to the Government that use of twenty-four-hour shifts, which the Government had directed, was creating unnecessary inefficiencies. The Government concedes that this suggestion was not accepted or acted upon. It also concedes that RWI made reasonable efforts to control its increased costs during the claims period and that the Government was aware that RWI was experiencing a loss of efficiency.

RWI also experienced significant cash-flow problems in keeping up with the dramatically increased payrolls during the Desert Operations. This was partly a function of the fact that the inefficiency meant it was not recouping its actual costs of operating, and also because the sheer volume of paperwork inundated the Government's best-efforts at keeping up with pay requests. During this time, Mr. Madison assured RWI that it would be paid for its allowable and reasonable costs plus a reasonable profit for the work performed during the claims period. In order to give him some basis for making interim payment on a claim, without awaiting the final increased cost, Madison requested that RWI submit its claims, based upon a total cost approach, but limited to discrete periods of time.

Between December 31, 1990, and July 1, 1992, RWI submitted six separate claims to the MTMC, totaling $18,724,462.00, for increased costs it claimed were incurred as a result of the Desert Operations.[7] The claims were asserted under the changes clause of the contract. These six claims prompted two contract modifications allowing for two interim payments of $5 million each toward the settlement of RWI's increased cost claims. The first modification was signed by RWI on December 23, 1991, and by the CO on December 27, 1991. The second modification was signed by RWI on September 5, 1992, and by the CO on September 8, 1992. The modifications specifically provided that changes incurred as a result of the Desert Operations were "considered changes in conditions within the meaning of the Revision in Prices Clause ... of the contract." The modifications preserved both parties' rights to assert that the amounts claimed or paid were incorrect.

Both RWI and the Government anticipated that the interim settlement would be altered in the future to more accurately reflect actual

7. The six claims for increased costs, in the amounts represented in the re-certified claims, are summarized individually as follows:

| Claim | Period Covered | Date | Amount |
|---|---|---|---|
| 1. | 12 Aug. 90 to 30 Sep. 90 | 31 Dec. 90 | $2,122,504.00 |
| 2. | 1 Oct. 90 to 15 Jan. 91 | 26 April 91 | $2,453,517.00 |
| 3. | 16 Jan. 91 to 28 Feb. 91 | 27 June 91 | $4,359,962.00 |
| 4. | 5 Mar. 91 to 30 Sep. 91 | 26 Feb. 92 | $7,106,144.00 |
| 5. | 1 Oct. 91 to 31 Dec. 91 | 16 April 92 | $1,239,100.00 |
| 6. | 1 Jan 92 to 30 April 92 | 1 July 92 | $1,443,235.00 |

costs. The Government believed that RWI included many unallowable costs in its initial calculations, and thus asked for a Defense Contract Audit Agency (DCAA) audit of RWI's claims.[8] The DCAA auditor issued two reports—one on December 2, 1992, and another (as an amendment to the first) on August 19, 1993—addressing RWI's first six claims. These audit reports concluded that $13,621,369.00 of the $18,724,462.00 claimed by RWI was in fact unallowable or overstated.[9]

In a letter dated March 24, 1993, RWI responded to the first DCAA audit report by agreeing only that $3,576,641.00 of the questioned costs were unallowable or overstated in the areas of unemployment taxes and indirect costs. On September 27, 1993, RWI submitted its seventh certified claim for increased costs that occurred after termination of the Desert Operations for the period from May 1, 1992 to August 31, 1992, during what was termed the "European Retrograde." [10] RWI claimed that although this period was not officially part of the Desert Operations, it amounted to a changed condition for the same reasons—increased volume and decreased efficiencies—that justified the first six claims. This seventh claim asked for an additional $1,675,135.58. On October 14, 1993, the Government asked RWI to suspend its request for a final decision by the CO on its certified claims so that both parties could pursue a negotiated settlement. Several offers were considered by both parties, but ultimately they were unable to agree on a settlement.

On July 1, 1994, the CO—who was at that time Christina Dossman rather than Joseph Madison—issued a final decision that adopted the DCAA's audit reports, disallowed RWI's seventh claim in its entirety, and requested that RWI refund $4,896,907.00 to the Government. RWI disagreed with this final decision and brought the present action in this court on August 4, 1994, seeking "at least" $6,822,987.00, plus interest, in addition to the $10,000,000.00 already paid to it under the terms of the interim settlement. The Government brought a counterclaim seeking $4,896,907.00 for amounts it allegedly overpaid RWI under the terms of the interim modifications.

## Discussion

### A. Jurisdiction

■ Earlier in this litigation the Government asserted, and the court rejected, a motion to dismiss for lack of jurisdiction. The Government contended that the complaint presented a total cost claim while the seven individual claims were direct cost claims. The court denied the motion because the complaint does not fatally deviate from the claims presented to the CO. This issue arose again during trial, with the Government attempting to show that the first seven claims were so different in kind from the current proof that there was a fatal variance.

The evidence established the contrary. There can be no question, first, that the seven claims, collectively, constitute a total cost claim. The basis for calculating the increases in unit price, upon which those claims are based, is a total cost approach. Second, the parties' dealings during the claim period clearly demonstrate their understanding that the plaintiff's seven individual claims were preliminary estimates leading up to a total cost claim. The format used in the BAFO for calculating unit costs was used. The amount claimed was thus the difference

---

8. The first request for such an audit was made by the CO on May 28, 1992, and covered the first five submitted claims. An audit was later performed on RWI's sixth and seventh claims as well.

9. The first DCAA audit report disputed $12,807,438.00 of RWI's claims. The second audit report revised this figure to $13,621,369.00. In all, the DCAA auditor specifically found that RWI overstated its costs for: 1) direct labor ($4,531,571.00); 2) indirect overhead costs ($4,999,239.00); 3) federal and state unemployment taxes ($1,593,512.00); and 4) insurance ($2,491,790.00).

10. The "European Retrograde" involved the downsizing of the United States military presence in Europe by returning large amounts of equipment and munitions to the United States, much of which came through MOTSU.

between billing rates and actual costs.[11] Although the proof at trial was somewhat different in that it represents increases or decreases in particular categories of cost, and it is presented in a unified fashion, the only significant difference between the seven individual claims and the current amount sought consists of an increase in the profit element. As Omar Shipley, the DCAA auditor who has spent years auditing this contract candidly admitted, there is no practical difference between auditing the first seven claims and auditing the current total cost claim. There is no basis, therefore, for holding that the court lacks jurisdiction.

### B. Liability Issues

The Government has not challenged the fundamental assertion behind the claim, at least with respect to the first six claim periods (August 12, 1991 to April 30, 1992), that the change in conditions of operation at MOTSU were significant enough to trigger the changed conditions element of the revision of prices clause of the contract. Nor does it challenge RWI's assertion that the nature of the increase in costs (loss of efficiency) warrants resort to a total cost approach. The dispute over liability is thus limited to two matters. The first is whether the "seventh claim" period after the Desert Operations, i.e., the European Retrograde, was sufficiently different in character from what was anticipated in the contract such that it also warrants an equitable adjustment. The second is whether the appropriate contract method for determining the equitable adjustment in this matter, regardless of what period is covered, is the revision of prices clause or the changes clause.

### 1. The Seventh Claim Period

■ At trial, the Government conceded that the work performed by RWI during the first six claim periods was well outside of the work estimates contained in the contract. However, the Government contests RWI's claim that the work during the seventh claim period, from May 1, 1992 to August 31, 1992, was beyond the expectations of the contract estimates. The main focus of the Government's argument is that the changed conditions given as reasons for the prior claims were no longer present at MOTSU during this period. Specifically, the Government argues that the number of ships being loaded and unloaded during this period was reasonable, the less experienced labor had by that point become experienced, less labor was needed so that the most experienced labor was not diluted among as many work gangs, and the hours of operation had been reduced from 24-hours a day to levels within the realm of the contract's expectations. However, the Government's evidence at trial primarily compared this seventh claim period with the Desert Operations. RWI, on the other hand, chose at trial to rely on a comparison of its BAFO estimates with actual experiences during the seventh claim period. The court finds that the most appropriate basis on which analyze the work during the seventh claim period is to compare the BAFO and the original Government estimates contained in the contract with RWI's actual experience.[12]

The solicitation and the resulting contract both contained Government-provided estimates as to the amounts and types of cargo that the contractor could expect. The contract estimates the total breakbulk tonnage to be 27,561 measured tons (approximately 1148 measured tons per month) and the total automated tonnage to be 161,410 measured tons (approximately 6725 measured tons per month).[13] RWI's BAFO anticipated approxi-

---

11. In addition, some of the work performed by RWI during the Desert Operations had no corresponding commodity rate set out in the contract. RWI billed or claimed for these amounts on a reimbursement plus profit basis.

12. It is not enough simply to look at actual work experienced during the period of the contract prior to the commencement of the Desert Operations. This is because, prior to the Desert Operations, RWI was experiencing less than the estimated amounts of work at MOTSU and, as a result, was experiencing a financial loss at that time for MOTSU.

13. The contract and RWI's BAFO also provided for estimates on breakbulk and automated work not estimated in measured tons, but in square footage or number of items. These items were primarily listed as carpentry materials or "containers" for "container cranes" and "ships gear/shore crane." Their inclusion does not materially alter the estimates utilized for the court's analysis of this issue.

mately 920 measured tons of breakbulk cargo per month and approximately 6483 measured tons of automated work per month. Thus, the Government's estimate was that 83 percent of the total tonnage would be automated rather than breakbulk (compared with RWI's estimated 86 percent ratio).

The actual experiences of RWI during the seventh claim period do not mirror the estimates in the contract. For example, employing the Government's own higher estimates, it would have expected approximately 4600 measured tons of breakbulk during this period. The actual breakbulk work experienced during this period was over 60,000 measured tons. This amounts to more than a thirteen-fold increase in breakbulk tonnage. The significant increase in breakbulk work implies a corresponding increase in man-hours needed to perform the work, regardless of whether the BAFO man-hours or the Government estimates are employed. Moreover, the actual automated-breakbulk ratio also changed radically, with automated work moving from the estimated 83 percent to less than 35 percent of the total tonnage. In addition, the materials being shipped were poorly inventoried and stacked. Goods were frequently loaded in a haphazard, disorganized manner, all of which made the unloading at MOTSU less efficient.

The Government is correct, however, that by May of 1992, RWI could no longer complain of the inexperience of the workforce at MOTSU. By that time, the longshoremen who began in 1990 with little experience had gained skills and experience—allowing for greater productivity. The Government also argues that the ships that came into MOTSU during the seventh claim period were of the type anticipated by the contract. The trial testimony of Harriet Benton, the Administrative Contracting Officer (ACO), was that the ships coming into MOTSU during the seventh claim period were not the "rust buckets" seen during the height of the Desert Operations. However, on cross-examination she also admitted that one berth used by RWI, which contained the more efficient "Paceco" cranes, was not usable during this time because of railway repairs being made. The other substitute cranes were not as efficient.

In sum, although the conditions were not as difficult as they had been during the Desert Operations, the court is satisfied that the conditions RWI experienced during the seventh claim period (May 1, 1992 to August 31, 1992) were sufficiently outside the scope of the volume and type of work anticipated by the contract to entitle RWI to an equitable adjustment for its efforts during this period.

2. *The Revision of Prices Clause versus the Changes Clause*

■ RWI asserts that the equitable adjustments to which it is allegedly entitled on this contract fall under the changes clause of the contract, which provides:

> The Contracting Officer may, at any time by written order ... make changes within the general scope of this contract. If any such change causes an increase or decrease in the cost of the performance of any part of the work under this contract, an equitable adjustment shall be made in the contract price or in the applicable schedule of rates and the contract shall be modified in writing accordingly.... However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.

Ross Drake, a former RWI officer, testified that RWI's claims to the Government during the contract period were specifically submitted under this clause. But a review of the seven claims reveals that, although the first three make specific references to the changes clause; the fourth claim refers to changes under "Modification P00005;" and the fifth, sixth, and seventh claims make no specific references at all.

The Government opposes RWI's characterization of the claims and argues that the proper clause for making any equitable adjustment is the revision of prices clause, which states, in part:

> At any time, and from time to time, subject to the limitations specified in this clause, either the Government or the Contractor may deliver to the other a written demand that the parties negotiate to revise the prices under this contract. ... [I]f the prices in the contract were arrived at as a result of competitive negotiation, the contract prices shall not be revised upward

except upon the basis of, and as justified by changes in conditions occurring after the contract was entered into.

The Government's argument is based on the language of the two contract modifications that provided RWI with the $10 million interim payment. Indeed, each of the modifications expressly provides that it is executed pursuant to the revision of prices clause. Thus, while RWI requested an adjustment to its contract under the changes clause in at least three of its claims, the language of the resulting modifications gives weight to the Government's argument. However, Ross Drake also testified that RWI was aware of the modifications' reference to the revision of prices clause, and so specifically requested that language be added to clause b(3) of the modifications adding "or the Contractor's" to that clause. This clause of the modification provides, in part: "This interim settlement does not represent the Government's or the Contractor's final position with respect to either entitlement to or quantum of compensation on all cost items of the claims."

In any event, it is unnecessary for the court to determine which clause should apply in this case. The Government's primary motivation for asserting the revision of prices clause as the vehicle for the changes at issue appears to be the belief that the clause restricts RWI's claim for profit to the amount stated in the BAFO. However, as discussed *infra* fully *infra*, the revision of prices clause does not expressly refer to profit. Nor does the solicitation's "Contract Pricing Proposal Instructions to Offerors" refer to restrictions on profit for changes in condition. Rather, in referring to "wage adjustments," the proposal instructions state that "[n]o change shall be allowed in the dollar amount of profit in the contract." When referring to "requests for price revision based on change in conditions," the instructions do not place any such similar restrictions on profit. The changes clause also makes no reference to profit. Because the court finds no practical difference in applying either clause to the facts of this case, it will assume that the changes at issue are under the revision of prices clause of the contract as the Government suggests. Under either clause, the contractor would be entitled to recover its additional costs, whether calculated collectively or on a unit-price basis.

Other than its unsuccessful argument concerning variance, the Government has not challenged plaintiff's resort to a total cost approach. The court, in any event, finds that it is warranted here. Inefficiencies resulting from the massive increase in work are best measured, the court finds, by comparing actual experience with the bid prices. The Government evaluated and accepted RWI's explanation for its unit prices at the time of the bid. Specifically, in the "Business Clearance Memorandum," which provided analysis of RWI's initial bid and its BAFO, the Government stated that RWI's "pricing methods were ... reviewed and considered satisfactory," and that the "proposal provides an excellent baseline for future revisions." In addition, the plaintiff offered credible testimony that it was RWI's practice to bid high initially and save its more realistic bid for the BAFO. The court is thus untroubled by the sharp drop in unit prices between the initial bid and the BAFO. RWI had performed these same contract services at MOTSU continuously since 1980, and the court is persuaded the bid was accurate.

The parties do not dispute the amount RWI already has been paid. Accordingly, the remaining issue is the amount of its reasonable, allocable, and allowable costs.

## C. Damages

The trial testimony consisted in large measure of the competing views of Patrick McGeehin, the plaintiff's accountant expert witness, and of Mr. Shipley, and his supervisor, Barbara J. Irvin, the Government's designated accounting expert. There have been numerous audits and reviews by both the DCAA and Mr. McGeehin, as well as numerous responses and replies. There were competing reports prepared by both plaintiff and defendant as recently as a month before trial.

At trial, these competing views were focused on four specific areas: Home office overhead, workers' compensation insurance, social security taxes, and fixed indirect costs. In addition, there is a significant dispute regarding the appropriate method and rate

for determining profit on RWI's claims. Each of these issues is addressed below.

1. *Home Office Overhead*

■ Mr. Shipley spent a substantial amount of time performing the initial audits on the first six individual claims. He began his work in July 1992. In the initial audits, he did not review the home office overhead cost pool for unallowable costs. Mr. Shipley testified that the reason for this was that RWI was presumed to have already removed unallowables, and also that, at that point, the home office overhead allocation to MOTSU was not a "significant" amount of the total claim. In the later audits, however, the home office overhead allocation became the subject of inquiry by the DCAA. At that point, Mr. Shipley encountered two phenomena associated with RWI's financial records. First, the plaintiff had not carefully "scrubbed" its overhead cost pool to eliminate items that are expressly unallowable under government accounting regulations. Second, RWI was unable to provide Mr. Shipley with certain records from the claims period, without which Shipley could not accurately determine RWI's unallowable costs in the home office overhead pool.

FAR 31.201–6, which was incorporated into the contract, provides that "[c]osts that are expressly unallowable or mutually agreed to be unallowable. . . . shall be identified and excluded from any billing, claim, or proposal applicable to a Government contract. . . . When an unallowable cost is incurred, its directly associated costs are also unallowable." 48 C.F.R. § 31.201–6 (1996). RWI admittedly did not remove all such unallowable costs in its initial seven claims. This is confirmed in part by the testimony of James Lyons, RWI's former Chief Financial Officer, who admitted that he was unsure of what exactly was unallowable under the Federal

Acquisition Regulations (FAR) and the Cost Accounting Standards (CAS). Although Mr. Lyons testified that RWI was not a "rookie" at government contracting and had used its "best efforts" to exclude unallowable costs from its claims, as a practical matter, the evidence at trial indicated that RWI only removed costs from the overhead pool as the DCAA auditor challenged particular cost items.[14]

In addition, Mr. Shipley testified that approximately "14 boxes" of RWI's home office expense vouchers and reports for 1990 were missing, and that the same amount of material was missing for 1991. Without these records, Shipley was unable to fully assess the unallowable costs in RWI's home office overhead pool. Mr. McGeehin conceded that RWI could not locate some of the records requested by Mr. Shipley. Because of these missing records and RWI's failure to provide a sufficient "scrub" of its books, the Government contends now that all of RWI's home office overhead expense should be disallowed.

At trial, however, Mr. Shipley admitted that many of RWI's reported costs are in fact allowable. Prior to trial, the Government believed that RWI's proper home office overhead allocation to MOTSU was $1,469,407.00, while RWI thought $2,101,727.00 to be the correct allocation. Thus, the amount in dispute was $632,320.00. This disputed amount was broken down into executive and operations salaries, computer equipment expenses, legal fees, certain travel costs, and a fiscal-year accounting methodology issue.

Mr. Shipley's final audit position was that, in the absence of a proper "scrub" of the overhead pool and a full analysis of the missing records, fifty percent of the home office executive salaries and seventy-five percent of the operations expenses should be disallowed.[15] Ms. Irvin testified that the fifty

14. Mr. Shipley testified that RWI did initially remove what he termed "visible costs" from the overhead pool. These costs included bad debt expenses, interest expenses, charitable contributions, sales and marketing expenses, and political contributions. The costs were visible because RWI's accounting system had clearly marked categories identifying them. The Government's complaint is that many unallowable charges are not "visible" in RWI's accounting system, and

thus cannot be identified absent an in-depth audit analysis.

15. The reason proffered by the Government for disallowing executive salaries and operational expenses was that the executives spent a considerable amount of time engaging in otherwise unallowable activities such as traveling, business meetings relating to other contracts, meetings relating to prospective business, attendance at

percent and seventy-five percent ratios were more than generous under the circumstances, and that she had suggested disallowing the entire amount in this area. In addition, Shipley specifically questioned the allowability of items such as certain legal fees, trade dues (which he felt were actually lobbying expenses), computer equipment expenses, travel costs, business meeting expenses (such as alcohol and grocery costs), and lease payments on "hunting" properties. RWI removed most of these latter items from its claim after the DCAA audits.

■ The Government is correct that the plaintiff has the burden to prove its allowable costs by a preponderance of the evidence. *See Delco Elecs. Corp. v. United States,* 17 Cl.Ct. 302, 319 (1989). RWI admittedly did not initially comply with FAR 31.201–6. Plaintiff replies that it removed questioned costs as the DCAA requested; however, this is not sufficient. The contractor is required to make more than a minimal effort to remove those costs that are expressly unallowable under the FAR. It is not sufficient for a contractor to wait and see if the DCAA questions any submitted costs, and then remove them or argue their merits. Thus, the court is left with determining to what extent RWI should be penalized for failing to provide a scrub of its home office overhead cost pool. It is the court's view that because the contractor did not adequately review its claim for unallowable costs prior to its submission, and instead chose to rely on the DCAA to perform the review, RWI is not in a strong position from which to question Mr. Shipley's determinations. This finding is further supported by RWI's failure, even if an innocent one, to provide Mr. Shipley with the resources necessary to verify all costs. The alternative extremes are to disallow all overhead, or to disallow only those particular

items Mr. Shipley was able to support at trial. In the court's view, neither option is fair to the parties, nor would they, in all likelihood, be accurate. The most accurate and fair approach in the court's view is to adopt Mr. Shipley's pre-trial figure of $1,469,407.00 as the starting point for determining RWI's allowable home office overhead allocated to MOTSU. The court is persuaded that, while actual allowable costs exceed this figure, RWI should bear the difference as a penalty for its approach to pro-claiming costs.[16]

■ The $1,469,407.00 figure is only the starting point because a significant amount of the disputed home office overhead arises from the differing methods by which the plaintiff and the Government allocated the total home office overhead pool to MOTSU for the claim period. By its calculations, RWI's methodology yields $238,670.00 more in allocation to MOTSU for the claims period than does the Government's method. The Government's methodology was demonstrated at trial by Mr. Shipley. He testified that pursuant to the FAR, the contractor is required to use a "fiscal year" approach to the allocation of home office overhead. FAR 31.203(e) provides, in part, that "the base period for allocating indirect costs will normally be the contractor's fiscal year." 48 C.F.R. § 31.203(e) (1996). There are several listed exceptions to the fiscal year as the base period, but the plaintiff does not assert that any are applicable here.

RWI does not disagree with the view that a fiscal year must be used as the base period, but insists that its method is in full compliance with such a requirement. Both RWI's and Mr. Shipley's approaches first calculate indirect cost rates, which must then be applied to costs and revenue.[17] The dispute

---

national trade association meetings, attendance at various sporting events, and other social trips to such locations as Port Miller—a deer hunting retreat in south Alabama—and New Orleans. The Government asserts that the costs of engaging in these activities are expressly unallowable, so that the salaries of the executives amount to directly associated costs for the activities. The court disagrees, but in view of larger concerns the court has about the whole approach RWI took to proving its overhead pool, that disagreement is moot.

16. *See infra* note 18.

17. The determination of indirect cost rates by, and their subsequent application to, both costs and revenues was referred to at trial, and in the DCAA audit report, as a "two factor formula." Ms. Irvin testified that the Government did not take exception to its use as a proper method for determining the rates and the proper allocation amounts.

arises over what particular period to apply the cost rates against. Mr. Shipley testified that these rates are required by the FAR to be applied to the costs and revenues of RWI at MOTSU for the entire fiscal year—yielding an equal allocation for each month of the fiscal year. Once the equal monthly allocation is known, that number is multiplied by the number of months in the claim period for that year. Mr. McGeehin testified that utilizing Shipley's method dilutes the actual overhead costs experienced by RWI during the claims period for the years 1990 and 1992, because the Desert Operations work at MOTSU only occurred during parts of those two years. In Mr. McGeehin's view, the cost rates should be applied on the basis of actual costs incurred at MOTSU during the claim period, and not on an arbitrary chronological basis. As he explained, the initial allocation to MOTSU was based on its proportionate share of costs, and that same methodology should then be used to allocate within the fiscal year at MOTSU.

Under direct examination at trial, Ms. Irvin, the Government's expert, demonstrated what she believed to be the correct method for determining the home office overhead allocation to MOTSU. In a hypothetical, she testified regarding the following calculations:

***Assume the following:***

1. Indirect cost rate of 10% (determined using two factor fiscal year approach).

2. $5,000,000.00 home office overhead pool for the company as a whole.

3. $5,000,000.00 × .10 = $500,000 to be allocated to MOTSU

4. $10,000,000.00 in direct costs for MOTSU for the entire fiscal year.

5. $8,000,000.00 of the total direct costs for the year are incurred during the claims period for that year.

6. The claims period occurred in only half of the fiscal year (July 1 through December 31).

Ms. Irvin was then asked how to allocate an overhead amount to the claim period based on these facts. She testified that the overhead allocation ($500,000.00) is figured as a percentage of the total direct costs for the fiscal year ($10,000,000.00)—in the example yielding 5% ($500,000.00 / $10,000,000.00). This 5% ratio is then applied to the direct costs incurred during the claim period for the year ($8,000,000.00), yielding an allocation to the claim of $400,000.00 ($8,000,000.00 × .05). In other words, because eighty percent of the direct costs for the year were incurred during the claim period, eighty percent of the home office overhead allocation should be allocated to the claim period.

Although she apparently did not realize it at the time, Ms. Irvin's calculations in the above hypothetical directly confirmed the plaintiff's proposed methodology. Perhaps realizing this, Government's counsel proposed a second similar hypothetical, this time suggesting a more specific type of allocation—a $10,000.00 rent expense. Again, Ms. Irvin worked through the calculations in the same manner as that suggested by RWI in its claim, showing that the goal is to allocate costs to the claims period. In testifying about her calculations and the use of a straight-line method for allocating costs to the claim, Ms. Irvin stated that "the cost is—what we try and do is get the claim cost." She testified that where direct costs for the claim period are known, as they are here, there is no need to use a straight-line method. Later, the Government recalled Ms. Irvin to "clear up a mistake" in her earlier testimony. This time, Ms. Irvin stated that she had been mistaken in her earlier calculations of the two hypotheticals proposed by Government's counsel. However, she was not able to provide a cogent explanation of why she was initially mistaken or why Mr. Shipley's straight-line method was now viewed as correct.

In the court's view, Ms. Irvin's original view, that the goal is to allocate on the basis of costs incurred in the claim period, is correct. Mr. Shipley's method of allocating costs does not take into account the disproportionate amount of work performed by the contractor during the claim period. Mr. McGeehin's method takes this into account by "weighting" the claim period against the entire year on the basis of when costs actually were incurred. This latter approach begins by utilizing the fiscal year as "the base period for allocating indirect costs," and then

applies the resulting ratio to the revenues and direct costs of the claim period rather than the entire year. This is the appropriate method, as confirmed at trial by the Government's own expert witness. The court will thus accept RWI's calculation of $238,670.00 as the difference between the two methods and will add this amount to the overhead allocation allowed by the Government, resulting in a total home office overhead allocation to MOTSU of $1,708,077.00 for the total claim period.[18]

### 2. *Workers' Compensation Insurance*

The largest cost item in dispute involves the correct amount of workers' compensation insurance costs that should be allocated to MOTSU for the claims period. Although RWI was self insured[19] during the claim period, it calculated its insurance costs by using standard "state manual" rates,[20] which it contends are lower than its actual costs for self insurance. It seeks $5,447,097.00.[21] The Government disputes $2,955,888.00 of this amount. There are three sub-issues. First, the parties dispute the proper method required under the CAS for estimating total company-wide insurance reserves for a self-insured contractor. Second, the parties calculate the port allocation ratio using different bases. Finally, there is a dispute as to the proper method for applying the allocation ratio to determine the correct allocation of cost to MOTSU for the claim period.

■ The Government asserted at trial that the proper method for determining a self insured's total insurance costs, and the method required by both the CAS and the contract, is to use the company's annual actuarial experience to prospectively estimate total average loss. RWI had independent evalu-

ators perform annual actuarial reports on its workers' compensation insurance reserves. Although RWI used this actuarial information to estimate its total reserves company-wide, when it put together its claim here, it applied state manual rates (standard commercial rates) for North Carolina to estimate reserves for MOTSU during the years in which the Desert Operations occurred. RWI used these estimates as self-imposed "caps" on its claimed insurance costs. RWI maintains that if it did claim actuarial rates, the self-insurance costs allocable to MOTSU would be much higher than the state manual rates.

CAS 416 provides, in part, that a contractor which self insures must utilize the following accounting criteria:

> [A]ctual losses shall not become a part of insurance costs. Instead, the contractor shall make a self-insurance charge for each period for each type of self-insured risk which shall represent the projected average loss for that period. If insurance could be purchased against the self-insured risk, the cost of such insurance may be used as an estimate of the projected average loss; if this method is used, the self-insurance charge plus insurance administration expenses may be equal to, but shall not exceed, the cost of comparable purchased insurance plus the associated insurance administration expenses. However, the contractor's actual loss experience shall be evaluated regularly, and self-insurance charges for subsequent periods shall reflect such experience in the same manner as would purchased insurance.

48 C.F.R. § 9904.416–50(a)(2)(i) (1996). This means that a contractor may use commercial

---

18. The court is aware that the precise amount of RWI's calculated difference may in fact be over-estimated by some small amount—due to the inclusion in the calculations of certain unallowable costs. However, the court believes that, as a whole; RWI's home office overhead allocation is likely underestimated—especially in view of the court's full adoption of Mr. Shipley's determinations on unallowable costs. The court's view is further supported by the fact that RWI's total home office overhead cost in its claim represents only 2.5% of its total claimed costs.

19. RWI retained the first $300,000.00 liability per occurrence and maintained excess-coverage insurance through Lloyd's of London.

20. These are rates determined and published by the National Council on Compensation Insurance.

21. This amount consists of $5,381,431.00 specifically classified as "Insurance" in Mr. McGeehin's report, $58,781.00 classified as "Port Administrative Expenses," and an additional $6,885.00 included under the "Fixed–Indirect" cost heading.

insurance cost rates to project average loss. Thus, RWI is correct that it may initially utilize the state manual rates for calculating its self-insurance costs. However, CAS 416 also requires the contractor to regularly evaluate actual loss experiences and to make adjustments accordingly.

RWI had annual actuarial evaluations performed by independent evaluators, but did not use the results to alter insurance cost projections at MOTSU because of its "limited claims experience" as a self insurer at that port. At trial, Mr. Lyons testified that RWI did not move to a self-insurance plan at MOTSU until 1989, and that it takes "at least five years" of data to properly adjust the reserves. But RWI cannot ignore the language of the contract, which provides that "[a]ctual loss experience shall be evaluated regularly (at least annually), and self-insurance charges for subsequent periods shall reflect Contractor's actual loss experience in the same manner as would purchased insurance." RWI responds that such an actuarial determination would have resulted in higher costs than the state manual rates and that under the contract, "[t]he cost of self-insurance charged to the contract (or the combined cost of self-insurance) shall not exceed the cost of purchased insurance for comparable coverage." Thus, RWI's argument goes, it was limited to claiming the costs calculated using the state manual rates where those rates were lower than the self insurance costs determined by actuarial analyses.

In any event, it is unnecessary to determine the exact calculation that would result using the state manual rates with an annual adjustment for actual loss experience. Mr. McGeehin testified that the company-wide total estimated average loss for RWI was in the neighborhood of $9.8 million to $10.2 million, with RWI asserting the higher number as the correct figure. The Government's final estimate for RWI's total average annual loss was $9,789,883.00—just below Mr. McGeehin's stated range. However, this amount, calculated by Mr. Shipley, included an average loss estimate based on years that occurred after the claim period. The very nature of an annual loss estimate is that there is a risk, inherent at the time of the estimate, that the estimate may or may not be correct. The contract itself provides that "actual losses shall not become a part of insurance costs." This is because a contractor cannot know his actual losses on a prospective basis—thus there is a risk factor that must be calculated in the self-insurance costs incurred by the contractor.

The court finds that the average annual loss calculation for the claim period should not reflect loss estimates for the years subsequent to the claim period years because, although they reflect the actual average loss from hindsight, these estimates do not accurately reflect the risk undertaken by RWI at the time of the claim. Utilizing Mr. Shipley's numbers, the total RWI average annual loss for the years up until the end of the claim period is $10,213,096.00.[22] The court thus finds $30,639,288.00 to be a reasonable representation of RWI's total company-wide insurance costs for the three years that encompass the claim period at issue.

The next step, and the next dispute between RWI and the Government, is how to allocate this total down to MOTSU and the other ports of RWI. CAS 416–50(b)(2) provides that "[i]nsurance costs shall be allocated on the basis of the factors used to determine the premium, assessment, refund, dividend, or self-insurance charge...." The allocated amount must therefore be a function of some cost item upon which the annual estimates are determined. In other words, there must be a calculated ratio to apply to some cost element, present and identifiable at MOTSU and the other ports, during the claim period.

The Government suggests that the proper ratio is one of claims payments actually made for MOTSU during the claim years versus those losses paid company-wide. RWI opposes this method because it allegedly violates CAS 416 and the contract, which provide that "actual losses shall not become a part of insurance costs." The court's review

**22.** This figure includes the Government's estimate of $2,500,000.00 annually for insurance administration costs. RWI did not specifically challenge this amount at trial and the court finds it to be reasonable.

of the actuarial reports generated by the independent evaluators reveals that the risk estimates were developed as a function of direct labor—namely, as man-hours. Claims paid by the contractor during a given year are indeed one part of the actuarial analysis. However, the estimated loss reserve for any given year also includes amounts projected in prior estimates but not yet paid. Hence, data on the actual dollar amount of claims paid during a given year is useful for prospectively estimating the following year's reserves, but cannot accurately form the basis for allocating past loss experience.[23]

RWI, on the other hand, calculates the percentage allocation to MOTSU from its share of the company's total direct labor costs over the three year period. This results in a ratio of 16.59%, which is then applied to the total workers' compensation costs for the three years of the claim period ($30,639,288.00—as determined by the court above). As indicated above, the actuarial reports calculate workers' compensation loss estimates as a function of man-hours. Mr. Lyons testified that RWI's practice was to "book" its costs as a "rate that's charged per hundred dollars of payroll by the various worker classifications," but that the actuary looks at what the contractor "booked in terms of that rate times the hundred dollars per man-hour by the various classifications." In the court's view, the only reasonable method for calculating an allocation ratio for the various ports is by utilizing the same factor on which the costs are determined—namely, man-hours.

 The final dispute on this issue is how to further allocate a portion of the MOTSU insurance cost allocation to the claim period, which consists of only one full year and two partial years. The Government, similar to its position on allocating home office overhead, maintains that the allocation is easily determined by calculating a straight-line amount of insurance cost per month (based on the average annual loss estimate allocation to MOTSU) and multiplying it by the number of months in the claim period (twenty-four). Thus, for example, if the average annual allocation to MOTSU during each of the three claim years (1990, 1991, and 1992) is $1,694,352.60 ($10,213,096.00 × .1659), then the monthly allocation would be $141,196.05 ($1,694,352.60 / 12 months). The resulting allocation to the claim period would be $3,459,303.20 ($141,196.05.00 × 24.5 months in the claim period). This is very similar to the way in which the Government sought to allocate the MOTSU home office overhead allocation to the claim period. Mr. Shipley again testified that this straight-line method is required by both the FAR and the CAS.

However, the Government again proposes a methodology that disproportionately weights non-claim period performance. When a disproportionate percentage of the man-hours were performed during the claim period, the inclusion of nearly twelve months of non-claim man-hours in the allocation computation produces a deflated result. If the Government's method is applied, the same unrealistic allocation will occur as it did in the home office calculations.

In Mr. McGeehin's final report, he suggests that the better method is to simply apply the correct allocation ratio, based on direct labor dollars, to MOTSU's direct labor costs during the claim period. The parties agree that the direct labor cost for the claim period is $50,365,258.00. Applying the 16.59 % ratio adopted by the court to the total direct labor costs at MOTSU for the entire claim period of $50,365,258.00 yields a total cost of $8,355,596.30. This result is consistent with both the FAR and the CAS because, similar to the home office overhead allocation issue, the base period for the initial allocation is the fiscal year.[24] The goal of the

23. The inadequacy of the Government's method as an accurate predictor is also evidenced by its calculation of the MOTSU loss ratios for the claim years. In 1990, the ratio is 9.46%; in 1991, the ratio jumps to 18.20%; and in 1992, the ratio falls to 6.19%. The only phenomena that explains the 1991 jump in claims paid is the significantly increased direct labor for that year, suggesting that man-hours is the relevant basis for allocating related costs.

24. CAS 406 only requires that the fiscal year be the base period for allocating amounts to the cost objectives—or, in this case, the individual ports of RWI. Once the question turns to how to further allocate to the claim period there is no such restriction.

calculation is to allocate an appropriate cost to the claim period.

However, in its claim, RWI does not ask for the $8,355,596.30 that its actuarial calculations would purportedly yield as a correct total cost for insurance. Instead, as discussed earlier, it relied on the state manual rates as a "cap" on its allocable insurance charge and asks for $5,381,431.00. RWI's claimed cost for insurance is, in the opinion of the court, most likely underestimated from an actuarial standpoint. The court holds that the amount claimed by the plaintiff for insurance, $5,381,431.00, is both reasonable and appropriate.[25]

### 3. Social Security Payroll Taxes

In its final total cost claim to this court, RWI states that it incurred $4,663,362.00 in payroll taxes. The Government believes that this amount is overstated by $115,897.00 due to RWI's improper calculation of the effective social security (FICA) tax rates for its employees. The Government's position is that applying the full statutory rate (7.65%), as RWI initially proposed, overstates costs because some RWI employees made in excess of the FICA ceiling. When an employee earns in excess of the ceiling (here $53,-500.00), the effective rate will be lower because no FICA taxes are paid on the amounts in excess of the ceiling.

Both the Government and RWI used average rates to determine the proper amount of FICA to include in the payroll tax cost of the claim. Not surprisingly, however, the Government estimates a lower effective rate than does RWI. At trial both parties made convincing arguments that the other side's numbers were either inflated or underestimated. The Government argued that RWI based its estimates only upon the union labor employed at MOTSU, that it failed to include administrative salaries for employees such as Gloria Sykes, RWI's port manager at MOTSU, and that it also failed to include the labor information from the Wilmington port. For its part, RWI pointed out that the Government based its estimates on the company-wide total labor figures, which included the

high executive salaries of the home office. It contends that the inclusion of Wilmington labor would not "materially" alter the effective rates.

Both parties are correct that the effective rates calculated by the other are not completely accurate. Both concede that their calculations are only estimates drawn from averages. The court finds that the most accurate figure lies somewhere between the narrow divide proposed by the parties, and that the best method of determining the proper amount is to take an average of the proposed estimates. Utilizing RWI's gross payroll records, which both parties relied on formulating their respective estimates, the court determines that the proper FICA over accrual is $170,530.00. Therefore, the total amount of payroll cost allowable in RWI's final claim is $4,605,414.00.

### 4. Fixed Indirect Costs

In its final position, the Government questioned $238,096.00 of RWI's claimed fixed indirect costs of $3,859,101.00. This questioned amount is broken down into $193,866.00 for costs associated with a sale-leaseback agreement, $34,203.00 for certain expensed assets, $3,142.00 for a duplicated posting amount, and $6,885.00 for insurance costs. The court has already addressed the $6,885.00 for insurance costs, and RWI does not contest the $3,142.00 for a duplicated cost amount.

■■■ The largest amount questioned by the Government concerns the costs associated with RWI's sale of certain equipment to, and the subsequent leasing back from, Joy Finance/Boston. The Government's position is that FAR 31.205–36(b)(2) limits the allowable costs for this transaction to those costs "... up to the amount the contractor would be allowed if the contractor retained title." 48 C.F.R. § 31.205–36(b)(2) (1996). This amount, in the Government's estimation, is limited to the depreciation charge that RWI could have claimed had it not entered the sale-leaseback agreement. Mr. Shipley calculated that RWI charged costs at the full

---

**25.** The methodology adopted by the court here applies equally to the workers' compensation costs of $58,781.00 included as "Port Adminis-

trative Expenses," and to the $6,885.00 included as "Fixed Indirect" costs. See supra note 21.

market value for the leased equipment (rather than at the depreciated amount), and that it charged for some equipment that could not be located in maintenance records as even being at MOTSU.

RWI's accounting and damages expert did not provide much insight on this question. In Mr. McGeehin's final report, his defense of the questioned amounts was limited to the following: "With respect to the sale leaseback agreement, we are unable to determine the basis for DCAA's unallowable cost calculation of $193,866 from its working papers. As a result, we have not removed this cost." Mr. McGeehin testified that "I'll have to wait until we hear Mr. Shipley's testimony [on the sale leaseback agreement question] because I don't know what that is or the basis for the ... calculation." Following Mr. Shipley's testimony, in which he explained that in the DCAA's estimation RWI was "double-dipping" by costing rental rates on fully depreciated equipment, RWI offered no rebuttal testimony on this question. The burden to prove costs is upon RWI. The court finds that the entire $193,866.00 should be excluded from the total cost claim as fixed indirect costs.

In its final audit report, the DCAA also questioned $34,203.00 for costs of expensed items that it argues should have been capitalized. The evidence submitted at trial reveals that these questioned items include radios, used buses (and their respective "overhaul" costs), a burster, an air compressor, and an industrial cable cutter and its accessories. The Government asserts that these items were of significant cost and had a valuable life over several accounting periods, thus they should have been capitalized and their costs depreciated over their useful life. RWI's response in the final McGeehin report is that each of the questioned items has a "small dollar" cost, and that even if the items should have been capitalized, the ten-year lives selected by the DCAA were "much longer than the useful life for these types of items."[26]

Mr. Shipley testified that RWI's policy, as evidenced by its CAS disclosure statement,

was to apply a $2000.00 cost criteria and a two year service life requirement for capitalization of assets. The result of this policy was that any item purchased for $2000.00 or less was expensed rather than capitalized. Mr. Shipley stated that the CAS in effect at the time of the contract required that items with a cost exceeding $1000.00 and a service life of at least two years be capitalized. Although the current version of the CAS sets a ceiling of $5000.00, Mr. Shipley is correct that during the initial years of the contract the ceiling was only $1000.00.

Mr. Shipley admitted that the radios and their accessories were below the $1000.00 ceiling when considered individually. The court questioned Mr. Shipley regarding why these individual items—which were admittedly below the capitalization criteria—should be aggregated into one lump sum to be capitalized. He testified that "[t]he CAS refers to a small complement of items that in itself does not exceed the capitalization criteria ceiling of $1000, but in the aggregate the purchase of all of those items represent a material cost."

The CAS does make specific reference to such "complements" of low cost items. CAS 404–30(a)(2) defines such a complement, and provides:

> Original complement of low cost equipment means a group of items acquired for the initial outfitting of a tangible capital asset or an operational unit, or a new addition to either. The items in the group individually cost less than the minimum amount established by the contractor for capitalization for the classes of assets acquired but in the aggregate they represent a material investment. The group, as a complement, is expected to be held for continued service beyond the current period. Initial outfitting of the unit is completed when the unit is ready and available for normal operations.

48 C.F.R. § 9904.404–30(a)(2) (1992). The radios and related accessories were arguably bought as "new additions" to an operational unit (MOTSU), and may therefore be reason-

---

**26.** However, RWI offered no alternative useful life calculations for the court to consider.

ably aggregated under this provision—and thus should not have been expensed.

The remaining items questioned by the DCAA separately exceeded the CAS established criteria for capitalization, and thus were properly adjusted by the Government.[27] The DCAA thus properly treated a total of $34,203.00 as costs that should have been capitalized. Therefore, the court finds that $231,211.00 of the questioned $238,096.00 for fixed indirect costs should be excluded from RWI's total cost claim. This adjustment leaves a net amount of $3,627,890.00 for fixed indirect costs in RWI's total claim.

### 5. Profit

■ The final area of significant dispute between RWI and the Government concerns the correct method and percentage for calculating profit. In its BAFO, RWI provided, as required, a breakdown of how it calculated unit prices on the principal contract work items. Included in this breakdown was a figure of five percent of direct labor for profit. Actual earned profit may have been higher (or lower) than the five percent reflected in the cost breakdown, however, by virtue of the fact that the per unit price agreed to by the Government was only based on projected costs and productivity. Ms. Sykes testified, as did John McCarron, the former CEO of the company, and Ross K. Drake, former Vice President of Sales for RWI, that, based on consistent prior experience, they anticipated that the actual profit would be in the range of twelve to twenty percent of "burdened" direct labor. Even if prices were not adjusted, in other words, RWI might make more or less than the "bid" profit by either an increase or decrease in the amount of cargo moved per gang hour.

During the contract period, but before the claims period (November 6, 1989 to August 11, 1990), RWI's productivity was actually less than either its projection or its bid assumption. In fact, it was in a loss position. Mr. McCarron testified that this was due to an unexpected and dramatic drop in volume.

Some fixed costs and overheads remained the same but there was insufficient traffic to permit recovery of those costs. The court accepts this explanation. Based on the testimony, the court is persuaded that RWI expected to make more than five percent profit on direct labor, and, based on experience, that was a reasonable expectation.

The Government argues, however, that RWI is limited by the terms of the contract from recovering more than the five percent profit on direct labor that it included in the BAFO. This position is based on two assumptions. The first is that the claim here is controlled, not by the changes clause, but by the revision of prices clause. Because it does not alter the result, the court will accept that assumption. The second assumption is that, within the revision of prices clause, repricing prompted by "changed conditions" is subject to the limitation that "[n]o changes may be allowed in the dollar amount of profit in the contract." This phrase is drawn from the "Instructions to Offerors" included in the solicitation. The language the Government relies, on, however, is taken from an explanation of how price revisions prompted by wage adjustments are implemented. There is a separate section of the policy that specifically addresses revisions based on changed conditions. It imposes no comparable limitation. Instead, "each claim will be considered individually on its own merits." The revision of prices clause itself has no comparable limitation. It states that "contract prices shall not be revised upward except upon the basis of, and as justified by[,] changes in conditions occurring after the contract was entered into." There is no specific reference to profit.

Alternatively, the Government relies on a practice of MTMC of not permitting price revisions of any kind to incorporate a profit rate different than that reflected in the BAFO. In view of the clear language of the instructions to bidders, and the absence of any specific prohibition in the revision of prices clause itself, however, the court de-

---

**27.** The court is aware that the DCAA also added certain "overhaul" costs to the capitalized amounts for the aging buses bought by RWI. While typical maintenance and repair costs are expensed rather than capitalized, the CAS pro-
vides that "[t]he cost to acquire a tangible capital asset includes the purchase price of the asset and costs necessary to prepare the asset for use." See 48 C.F.R. § 9904.404–50(a) (1992).

clines to impose this practice as a limitation on the contractor's right to claim an appropriate profit when changed conditions require repricing. The limitation makes sense when the contractor is seeking higher prices on a strict pass-through basis because of wage increases. In view of the myriad possible grounds for revisions due to "changed conditions," however, the more typical practice of making the profit fit the circumstances seems appropriate.

The contract provides that a request to revise prices will "use the cost and pricing data furnished by the Contractor with the best and final offer as the baseline for computing new prices." The court does not view this as a basis for precluding the contractor from seeking a higher percentage profit. Therefore, starting with the BAFO as a baseline, the question becomes whether RWI is entitled to a profit percentage greater than five percent of direct labor. RWI argues that its profit percentage should be based, not on direct labor, but on its total costs. Although the Government's argument focused on its incorrect assumption that the revision of prices clause prohibits the renegotiation of profit, evidence was presented at trial that would suggest that profit, even if recalculated, should still be applied against direct labor.

The testimony presented by RWI established that the expected profit percentages for this contract, though stated at rates of anywhere from twelve to twenty percent, were based on direct labor costs and not total costs. For its part, the Government presented the testimony of Harriet Benton, who indicated that five percent of direct labor was the rate she had seen for RWI at MOTSU on prior contracts. In addition, Ms. Dossman testified that a stated profit rate of five to ten percent of "selected" direct labor was typical for stevedoring contracts. The evidence introduced at trial by both parties satisfies the court that it is standard practice for profits on stevedoring contracts to be priced as a percentage of direct labor. Thus, the court will here attempt to determine an appropriate profit percentage for application against direct labor costs.

To determine the appropriate profit percentage, the plaintiff suggests the use of the "weighted guidelines method" found in the FAR. *See* 48 C.F.R. § 215.971 (1996). The weighted guidelines are employed by contracting officers to calculate profit objectives on negotiated government contracts that require cost analyses. Although used primarily for the pre-award calculation of profit objectives, the testimony of Ms. Dossman revealed that these guidelines are occasionally employed to determine profit objectives for equitable adjustments. The weighted guidelines calculate profits as a percentage of total costs rather than of direct labor. This, however, does not preclude their use by the court as a general guide for determining the appropriate profit rate here. Therefore, it is useful to determine what percentage profit the court would find if it applied the weighted guideline method.

The weighted guidelines provide that the profit objective is a function of three factors: Performance risk; contract type risk; and facilities capital employed. They also provide:

> The contracting officer assigns values to each profit factor; the value multiplied by the base [ (allowable costs) ] results in the profit objective for that factor. Each profit factor has a normal value and a designated range of values. The normal value is representative of average conditions on the prospective contract when compared to all goods and services acquired by the ... [Department of Defense].

48 C.F.R. § 215.971–1(b) (1996).

Performance risk is given a normal overall value of 4%. The total standard range is stated as 2% to 6%. This range can be increased to 4% to 8%, with 6% being the normal value, for service contractors that "require relatively low capital investment in buildings and equipment when compared to the defense industry overall." *Id.* 215.971–2(c)(2). RWI's contract at MOTSU was a service contract, and the land and buildings at MOTSU are Government property. In addition, the equipment owned by RWI was not purchased as a capital investment to benefit the Government so much as it was purchased to enable RWI to meet the basic

minimum requirements of its business as a stevedore. Thus, the court will look to the "alternate" range of values for performance risk. However, utilizing the alternate values removes from consideration any assignment of profit for the facilities capital employed risk factor. *See id.*

The performance risk factor is subdivided into technical (30%), management (30%), and cost control (40%) factors. These three sub-factors are then given a weighted average and added together to arrive at the total profit percentage for the performance risk factor. First, technical risk is evaluated by considering: "(i) [The] [t]echnology being applied or developed by the contractor; (ii) [t]echnical complexity; (iii) [p]rogram maturity; (iv) [p]erformance specifications and tolerances; (v) [d]elivery schedule; and (vi) [the] [e]xtent of warranty or guarantee." *Id.* 215.971–2(d)(1). RWI's contract with the Government did not involve a high degree of technical risk to begin with, thus it was, at best, in the "normal" range of 6% at award. During the Desert Operations this did not change dramatically. The amount of the work increased and the efficiencies decreased, but the technical requirements of the work and the technologies involved did not materially change. RWI should receive a "score" on this subfactor of the normal 6%.

The second subfactor evaluated is management. The evidence at trial indicated that, during the Desert Operations, RWI experienced significant increased demands on its management capabilities, both in personnel and otherwise. Under the weighted guidelines, "the contracting officer may justify a maximum value when the effort—(A) Requires large scale integration of the most complex nature; (B) Involves major international activities with significant management coordination ...; or (C) Has critically important milestones.". 215.971–2(e)(2)(ii). The court has no trouble determining that, under the circumstances presented by the Desert Operations, the contractor would be entitled to the maximum value on this subfactor of 8%.

Under the cost control subfactor, the contracting officer evaluates "[t]he expected reliability of the contractor's cost estimates ...; [t]he contractor's cost reduction initiatives ...; [t]he adequacy of the contractor's management approach to controlling cost and schedule; and ... [a]ny other factors which affect the contractor's ability to meet the cost targets." *Id.* 215.971–2(f)(1). RWI suggested changes to the Government that might have contained costs. The Government conceded that RWI did a good job in containing overall costs. However, these are basic requirements for satisfactory performance under the cost control factor. There is nothing in the evidence submitted at trial to indicate that RWI would be entitled to more than the normal value of 6% for this subfactor.

To determine the overall value on the performance risk factor, the individual subfactor values must be weighted. This is accomplished in the following manner:

| Subfactor | Weight (×) | Score = | Weighted Percentage |
|---|---|---|---|
| Technical | 30% | 6 | 1.8 |
| Management | 30% | 8 | 2.4 |
| Cost Control | 40% | 6 | 1.8 |
| Composite Value | 100% | | 6.0 |

Thus, RWI's total estimated value on the performance risk factor would be 6%.

The second risk factor requires the contracting officer to assign a profit objective percentage based on "the degree of cost risk accepted by the contractor under varying contract types." *See id.* 215.971–3(a). RWI's contract at MOTSU is best classified as a firm-fixed price contract with financing because the contractor was to be paid on a commodity rate basis for most of the work

and, to a large extent, received financing.[28] The weighted guidelines place a range for this type of contract at 2% to 4%, with the normal value being 3%. Factors considered include the "[l]ength of contract; . . . [a]dequacy of cost data for projections; . . . [e]conomic environment; . . . [n]ature and extent of subcontracted activity; . . . [p]rotection provided to the contractor under contract provisions (e.g., economic price adjustment clauses); [and] . . . [t]he ceilings and share lines contained in incentive provisions." *Id.* 215.917–3(d). A consideration of these factors does not reveal any indication that RWI would have expected any greater than the normal value for risk on this factor. RWI had been the Government's primary stevedoring contractor at MOTSU for many years when this contract was awarded. The court is satisfied that RWI's value on the contract type risk factor should be 3%.[29]

The final factor that would normally be considered under the weighted guidelines is that of facilities capital employed. This provision "focuses on encouraging and rewarding aggressive capital investment in facilities that benefit . . . [the Department of Defense]." However, by applying the alternate range of profit values for the performance risk factor, there is no need to calculate an estimate for this factor. *See id.* 215.971–2(c)(2). In sum, the application of the weighted guidelines to RWI's contract with the Government, as it existed during the Desert Operations, yields a profit of approximately 9%.

Allowing 9% on total costs, as derived through application of the weighted guidelines, would be the equivalent of allowing approximately 15% on direct labor. That would be in the middle of the range that the plaintiff's witnesses testified would be typical for the expected profit result on the contract. RWI asks the court to award it a profit of 12% on all costs, which is the equivalent of nearly 20% profit on direct labor. The Government insists that RWI should be limited to the 5% of direct labor reflected in the BAFO.

There are strong considerations militating against both the high estimate of RWI and the low estimate of the Government. Initially the court believes that the BAFO figure is the proper presumptive starting point, both in terms of percentage and in terms of labor costs versus total cost. The fact that RWI was in a loss position, although not controlling,[30] is also relevant. Two other factors weigh very heavily, however, in favor of a larger percentage (although not in favor of expanding profit to a percentage of all costs). The first is the overwhelming evidence that RWI would have made, under normal conditions, more than 5% profit on direct labor. The second has to do with the truly extraordinary effort RWI made in facilitating this nation's Desert Operations. The Government called upon RWI to perform over and above its expected levels by a factor of ten. It overcame difficult obstacles at every level to accomplish the objectives imposed upon it by the United States military. Joseph Walton, MTMC's former chief of cargo operations at MOTSU (and a continuous Government employee at MOTSU from its creation in 1955 until his recent death), characterized RWI's efforts as excellent.

**28.** "No financing means that the contract either does not provide progress payments, or provides them only on a limited basis . . . ." 48 C.F.R. § 215.971–3(c)(2) (1996). "With financing" refers to progress payments during the life of the contract. *Id.* Here, during the life of the contract, RWI was paid on an on-going basis at the initial commodity rates specified in the contract. These payments are consistent with the definition of financing in the weighted guidelines. RWI also received, albeit late, two $5 million dollar payments toward its claims.

**29.** The court is aware that the Government believes that the court should define the contract as a cost-reimbursement type (with its correspond-

ing low value) in view of the total cost claim analysis presented by RWI at trial. Such a low value for risk would, however, fail to acknowledge the fact that RWI had no assurances, at the time, that it would indeed be paid its costs plus a reasonable profit.

**30.** RWI was admittedly in a loss position at MOTSU prior to the beginning of the Desert Operations. As a general matter, a contractor cannot use a change in conditions to take it from a losing position to a winning one. That proposition does not fully encompass the circumstances presented under the unique facts of this contract, but nevertheless is a factor the court will consider.

Despite the imprecision involved in assigning a specific profit percentage here, the court has considered all of the factors mentioned in the weighted guidelines as well as the practicalities of the actual experience at MOTSU. It is the court's view that a profit percentage of 10% of direct labor reasonably compensates RWI for its efforts and is consonant with its original expectations. Therefore, the court will allow RWI a profit equal to 10% of its direct labor costs of $50,365,258.00. This results in a profit figure of $5,036,525.00.

The total claim figures agreed upon by the parties, and those determined by the court in this opinion, are summarized as follows:

| Costs: | |
|---|---|
| Direct Labor | $ 50,365,258.00 |
| Payroll Taxes | 4,605,414.00 |
| Fringe Benefits | 13,279,494.00 |
| Insurance | 5,381,431.00 |
| Other Direct Costs | 2,772,362.00 |
| Fixed Indirect | 3,627,890.00 |
| Port Admin. Expenses | 1,011,596.00 |
| Home Office Overhead | 1,708,077.00 |
| Other | (122,770.00) |
| | |
| Total Costs: | 82,628,752.00 |
| | |
| Profit at 10%: | + 5.036.525.00 |
| | |
| Total Costs plus profit: | 87,665,277.00 |
| | |
| Total Revenue: | (84,163,879.00) |
| | |
| Total Entitlement Before CDA Interest: | $ 3,501,398.00 |

The court holds that RWI is entitled to an additional $3,501,398.00 for changes in conditions resulting from the Desert Operations and the European Retrograde that occurred on its contract with MTMC at MOTSU. Accordingly, the Government's counterclaim is rejected in its entirety.

■ Finally, plaintiff is entitled to interest on its recovery at the rate specified by the Contract Disputes Act (CDA). *See* 41 U.S.C. 611 (1994). The remaining question is the proper date from which the interest should be calculated. The plaintiff suggests October 27, 1992 (thirty days after the second $5 million payment by the Government). The court holds that, under the particular circumstances of this case, the correct date for calculating CDA interest is September 27, 1993, the date on which RWI filed its seventh claim. As of that date, the total claim period was completely encompassed within RWI's cost claims. Although the specific amounts allegedly due in the claims were not finalized, the fact of the existence of a total cost claim covering the entire claims period was established on this date and all costs had been incurred.

### Conclusion

The clerk is directed to enter judgment for plaintiff in the amount of $3,501,398.00, plus interest at the CDA rate from September 27, 1993. The Government's counterclaim is dismissed. Costs to plaintiff.